Argued October 5, reversed and remanded November 6, 1917.

SUND & CO. *v.* THE FLAGG & STANDIFER CO.[*]

(168 Pac. 300.)

**Evidence—Adding to Written Contracts—Parol Evidence.**

1. Under Section 713, L. O. L., relating to construction of written contracts, parol evidence cannot be employed to add a term to a written contract, unless it appears from an inspection of the writing, in the light of the circumstances under which it was made, and the situation of the subject and the parties, that the writing is incomplete.

**Evidence—Written Instruments—Collateral Verbal Contracts—Parol Evidence.**

2. Where a grading contract states price for different classes of excavation, an oral agreement that defendant's engineer's grading, as to classification thereof, shall be final is not of such a collateral or

---

[*]For cases passing on the general rule that parol evidence is not admissible to vary, add to, or alter a written contract, see note in 17 L. R. A. 270.                                                              REPORTER.

independent nature as to allow its proof by parol as a separate agreement.

**Evidence—Written Instruments—Adding Thereto by Parol Evidence.**

3. A grading contract complete on its face, providing different amounts for different classes of excavation, cannot be added to by parol to show a verbal agreement, upon which the written contract was based, that the classification of defendant's engineer should be final.

[As to supplementing written contract by proof of collateral oral agreement, see note in Ann. Cas. 1914A, 454.]

From Multnomah: GEORGE N. DAVIS, Judge.

Department 1.    Statement by MR. JUSTICE HARRIS.

This is an action by subcontractors against the principal contractor for a balance claimed to be due for construction work done on a logging railroad. The defendant The Flagg & Standifer Company, a corporation, contracted to build a logging railroad for the Silver Falls Timber Company. The Flagg & Standifer Company subcontracted to the plaintiffs J. Sund, Joe Johnson, Carl Lundberg and Gust Sund, who are partners but are referred to in the record as stationmen, the construction work between engineer's stations 115 and 148, and the defendant likewise subcontracted the construction work between certain other stations to Carl Ness and six others as partners or stationmen.

The agreement between the Sund partnership and the Flagg & Standifer Company was entered into orally in September, 1912, with the understanding that the agreement would afterwards be reduced to writing. The parties did not sign any writing until March, 1913, when they signed an instrument which reads as follows:

"Flagg & Standifer Company.
"Subcontract.
"Gentlemen: We hereby agree to sublet you the work of grading between station 115 and station 148 ap-

proximately, subject to the division of hauls, as shown on the profile of the Silver Falls Timber Co. (such limits may be passed in making borrow if directed by the Engineer) subject to the direction of the proper officials of this company and the stakes and other instructions as to the manner of performing the work that may from time to time be given by the engineer of said Railroad Company, and in accordance with the rules and specifications as to the manner of performing the work, the protection of right-of-way, adjacent tracks, traffic and wires, roads, etc., and failure on your part to obey and observe such rules and instructions in the most careful and competent manner will be deemed sufficient cause for your removal from the work and the cancellation of this agreement.

"In consideration of the faithful and proper performance of the work, in accordance with the above, we agree to pay you the following prices:

For Clearing ................. 60.00 per acre ·
For Grubbing ................125.00  "      "
For Solid Rock Excavation ...   .75  "   cu. yd.
For Solid Rock Borrow (embankment measure) ........      "     "  "
For Loose Rock Excavation...   .40  "     "  "
For Common Excavation......   .20  "     "  "
For Riprap (hand placed).....        "     "  "
For Overhaul ................   .01  "     "  "
    (Per 100 feet beyond 590 feet averaged.)
For logs in culverts 8¢ in place in structure.
For placing corrugated iron pipe 10¢ pr, lin. foot in place.

"For extra work, actual cost plus 10 per cent; per cent of gross extra work bills will be deducted to cover the cost of accounting.

"We will furnish you all the equipment and supplies necessary at prices and rentals in accordance with our schedule. The time for which equipment will be charged to you will commence from the day the same is turned over to you for your use, and it is under-

stood that you will, without expense to us, feed and care for the livestock furnished, and will keep the equipment in good repair, and turn same over to us at the expiration of the work in good serviceable condition, ordinary wear excepted.

"A deduction of $1.00 per month will be made for each partner or employee under this agreement, for which hospital service and medical supplies and attendance will be furnished same.

"Payment in full for work performed will be made (under this agreement) within five days at the completion and acceptance of the same, at the prices named herein, and it is hereby agreed and understood that said prices are the sole basis for settlement between the parties hereto.

"No payment will be made for uncompleted work or unaccepted work, and in case of default in the completion of the work hereunder, all estimates or moneys due will be treated as fixed and liquidated damages and will be forever retained by this company.

"You likewise agree, in consideration of the prices herein mentioned, to assume all risks attendant to the prosecution of the work and damages to all persons and property which may be caused by your operations hereunder; and in case such damages occur, the same shall be settled promptly by you, and in the event of your failure to do so, this company is hereby empowered to settle such damages as best it can, and charge the amount so paid to you as so much paid on account of this contract.

"It is understood and agreed that work under this contract shall be commenced not later than September 21, 1912, and shall be carried on continuously (——) with sufficient force to insure its completion at the earliest possible date, and in no case later than January 1, 1913. At least —— men actual working partners must sign this agreement and remain continuously upon the work until the completion thereof.

"The acknowledgment of this letter by your signatures below completes the agreement in accordance with all of the above stipulation.

"Yours Truly,"

Immediately after the oral agreement made in September, 1912, Sund and his partners commenced to work and continued to prosecute the work until they completed their subcontract on May 8, 1913. Upon the completion of the work the plaintiffs called upon the defendant for a final estimate and were given a paper purporting to show the number of acres cleared and grubbed, the amount of overhaul, the amount of common excavation, the quantity of loose rock removed and the amount of solid rock excavated. The plaintiffs made no objection to the estimate so far as it concerned the clearing, grubbing, overhaul and quantity of material excavated; but they were not satisfied with the classification of the excavated material. According to the estimate handed to the plaintiffs, there were 7,529.6 cubic yards of common excavation, and 9,603.2 cubic yards of loose rock and 2,214.1 cubic yards of solid rock were excavated; but according to the contention of Sund and his partners they excavated 13,788.7 cubic yards of solid rock while the remainder is to be classified as common excavation.

The Ness partners commenced work on their subcontract about October 10, 1912, pursuant to an oral agreement made three or four days previously with The Flagg & Standifer Company. The Ness partners and the defendant understood, however, that later on they would sign a written agreement when, as Carl Ness expressed it, the defendant "got it wrote up and ready for us"; and accordingly at some time in December, 1912, a writing similar to the one signed by the Sund partners was submitted to and signed by the Ness partners. The Ness partnership continued to work from October 10, 1912, until May 8, 1913, when the work was completed. Ness called upon the chief

engineer of the Silver Falls Timber Company for a final estimate and in a short time the engineer sent Ness a paper purporting to be a final estimate of the quantity and character of the work done. Ness and his partners were satisfied with the estimate so far as it related to the acreage cleared and grubbed, the amount of the overhaul and the yardage excavated, but, like Sund and his partners, they claimed that too much of the yardage was classified as common excavation and not enough as solid rock. The Ness partners assigned their claim to Sund and his partners and the latter brought this action to recover the balance alleged to be due on the two claims.

If the estimate handed to Sund and the one sent to Ness correctly state the amount and kind of work performed or if the estimates are binding and conclusive in this action, then the plaintiffs are not entitled to recover for the reason that they have been fully paid by moneys and supplies advanced to them by the defendant during the progress of the work. The defendant alleged in its answer that it agreed with both partnerships that upon completion of the subcontracts the chief engineer of the Silver Falls Timber Company should estimate the amount and classify the work done and that these estimates should be binding and conclusive upon the parties. Although the plaintiffs admit that the parties agreed that the chief engineer of the owner should estimate the quantity of material excavated, they deny that they agreed that the chief engineer should classify the work done or that his estimates should be binding and conclusive.

At the trial the plaintiffs introduced the written contract signed by them and the defendant in March, 1913, and the one executed by the Ness partners and the defendant in December, 1912. J. Sund and Carl

Ness appeared as witnesses for the plaintiffs, and. over the objection of the plaintiffs, the defendant was permitted to interrogate one about the. oral agreement made in September and to cross-examine the other about the oral agreement made in October, 1912. The defendant contended and the plaintiffs denied that certain answers given by these two witnesses on cross-examination showed that the plaintiffs and the defendant orally agreed in September, 1912, and the Ness partners and the defendant agreed in October, 1912, that upon completion of the respective subcontracts, the chief engineer should estimate the quantity and classify the work done by the stationmen and that his estimate should be final. The trial court was of the opinion that the cross-examination disclosed that the oral agreement was as claimed by the defendant and when the plaintiffs rested their case in chief granted a judgment of nonsuit on the motion of the defendant, on the theory that both contracts were partly in writing and partly oral and that the defendant was entitled to resort to parol evidence to prove all the terms that had not been reduced to writing. The plaintiffs appealed from the judgment, and they now contend, as they argued at the trial, not only that the answers of the two witnesses on cross-examination do not reveal an agreement to be bound by the final estimates of the engineer, but also that it was incompetent to resort to extrinsic evidence to add to the terms of the writings signed by the defendant and the stationmen.

REVERSED AND REMANDED.

For appellants there was a brief over the names of Messrs. O'Day & Haddock and Mr. M. J. MacMahon, with oral arguments by Mr. J. M. Haddock and Mr. MacMahon.

For respondent there was a brief over the names of *Mr. Ben C. Dey* and *Mr. Charles A. Hart,* with an oral argument by *Mr. Dey.*

Mr. Justice Harris delivered the opinion of the court.

It will not be necessary to determine whether the cross-examination of the two witnesses, J. Sund and Carl Ness, developed the fact that both partnerships agreed to be bound by the estimates of the chief engineer, although we note in passing that Sund stated in unequivocal terms, on direct examination, that the writing was like the oral agreement, that they never had any contract except the written one, and that they never at any time agreed to be bound by the estimates of the chief engineer, and, on redirect examination, J. Sund who appears to have conducted the negotiations for the plaintiffs, again testified in unmistakable language that they never agreed to be bound by the estimates of the chief engineer. Carl Lundberg said that the written contract was like the oral agreement, and in response to questions by counsel for plaintiffs Carl Ness swore that there was no understanding as to who was to make the classification for the purpose of final settlement. If it was incompetent for the defendant to add to the terms of the writing by showing that the oral agreement embraced some stipulation not found in the writing, then it is immaterial whether the cross-examination does or does not have the effect claimed by the defendant. The competency of the oral evidence relied upon by the defendant depends upon whether the writing is to be taken as the only evidence of the contract between the parties.

Throughout the investigation of the question for decision we must bear in mind that Section 713, L. O. L. provides that:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except in the following cases:

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings;

"2. Where the validity of the agreement is the fact in dispute. But this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in Section 717, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. * * "

1. However, the mere fact that a writing has been signed by contracting parties does not always preclude extrinsic evidence of additional terms not found in the writing; and, indeed, it is sometimes said to be the rule, although it is a loose generalization, that where a written instrument, executed pursuant to a prior verbal agreement or negotiation, does not express the entire agreement or understanding of the parties, it is competent to offer extrinsic evidence with reference to matters not provided for in the writing: 17 Cyc. 741. It is a nearer approach to accuracy to say that if by proper and competent means it is made to appear that a writing contains only a part of the agreement entered into, parol evidence may be received to prove the entire contract; but if the writing contains all that is necessary to constitute a contract and purports to be a complete expression of the whole agreement, it is presumed that the parties have introduced into it every

material item and term, and parol evidence is not admissible to add another term to the agreement, although the writing does not mention the particular item to which the parol evidence is directed: 10 R. C. L., p. 1030.

The authorities are not agreed upon the test to be employed in determining whether a writing is incomplete so as to permit the introduction of evidence to show an additional term in an agreement, and it would be useless to attempt to reconcile the variant expressions found in the books, although an analysis of many of the adjudications will disclose that as between a considerable number and perhaps a majority of the courts there is more of harmony and less of difference than might at first appear: 9 Ency. of Ev. 347; 17 Cyc. 746; 10 R. C. L. 1030; 1 Elliott on Ev., § 576; 4 Wigmore on Ev., §§ 2430, 2431. Obviously, the mere fact that the parties did in truth agree upon an additional term not found in the writing, is not of itself enough to open the door for extrinsic evidence, for if such were the doctrine but little would remain of the rule against varying written contracts by parol. More than a quarter of a century ago this court held in *Looney* v. *Rankin,* 15 Or. 617, 622 (16 Pac. 660), that the writing "must be in such a shape that it may be fairly inferred from the face of it that something has been omitted therefrom"; and while this case is frequently referred to as an authority for holding that the incompleteness of the writing must appear on the face of the document from mere inspection unaided by the circumstances under which it was made, the situation of the subject of the contract or of the parties to it, the opinion must nevertheless be read in the light of Section 717, L. O. L., which was enacted in 1862

and was in force when the case of *Looney* v. *Rankin* was decided in 1888.   Section 717, L. O. L., reads thus:

"For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

The right to offer evidence, when necessary, to show the circumstances under which a contract was made including the situation of the subject of the writing and of the parties to it does not mean that a clear and unambiguous writing can be made ambiguous or that an obviously complete document can be made incomplete by extraneous evidence.   The sole purpose of an inspection is to construe the instrument and to ascertain whether the writing is complete, and that question must be decided by an interpretation of the very language used in the writing; and in this case, as in other cases where it becomes necessary to interpret the language employed by contracting parties, evidence may be offered showing the circumstances under which the contract was made, the situation of the subject of the contract and the parties to it, so that the judge may be placed in the position of the parties and when so placed can interpret the language used by the parties and from that language determine whether the writing is complete.   A statement found in *Wheaton Roller Mill Co.* v. *John T. Noye Mfg. Co.*, 66 Minn. 156 (68 N. W. 854), is so apt that we here quote it:

"In short the true rule is that the only criterion of the completeness of the written contract as a full expression of the agreement of the parties is the writing itself, but, in determining whether it is thus complete, it is to be construed, as in any other case, ac-

cording to the subject matter, and the circumstances under which and the purposes for which it was executed": See also: 17 Cyc. 746; 4 Wigmore on Ev., § 2431 (b).

The rule under discussion is well illustrated in *American Bridge & Contract Co.* v. *Bullen Bridge Co.*, 29 Or. 549 (46 Pac. 138), where it appeared from the writings that one party agreed to deliver crushed rock on scows at a bridge site for a certain sum per cubic yard, but an inspection of the writings showed that the documents were silent as to the quantity of crushed rock.to be delivered by one and received.by the other party, and it was held that the writings did not constitute a complete contract and that therefore it was competent to offer parol evidence to show the amount of crushed rock contracted for. The rule is not enlarged by anything said in *Williams* v. *Mount Hood Ry. & Power Co.*, 57 Or. 251, 256 (110 Pac. 490, 111 Pac. 17, Ann. Cas. 1913A, 177), although the general doctrine is referred to in comprehensive language. If *Holmboe* v. *Morgan*, 69 Or. 395, 400 (138 Pac. 1084), is to be construed as holding that parol evidence is always admissible to show that an additional term contained in a prior oral agreement provided only the contract is not one required to be in writing by the statute of frauds, it is stating the rule too broadly. In *Stuart* v. *University Lumber Co.*, 66 Or. 546 (132 Pac. 1, 135 Pac. 165), attention is called to the fact that the writing is incomplete since "it makes no provisions as to the manner of delivery."

2. There is a rule which permits the use of parol evidence to prove a collateral agreement which does not interfere with the terms of the written contract although it may relate to the same subject matter and have occurred prior to or even contemporaneously

with the principal contract in writing. This principle is recognized in *Looney* v. *Rankin,* 15 Or. 617, 622 (16 Pac. 660), and is exemplified in *Lewis* v. *First Nat. Bank,* 46 Or. 182, 193 (78 Pac. 990). This rule, however, does not apply in the instant case because the oral stipulation averred by the defendant is so closely connected with the principal transaction as to be a part of it and is not merely a collateral and independent transaction: *Naumberg* v. *Young,* 44 N. J. Law, 331 (43 Am. Rep. 380); *Armington* v. *Stelle,* 27 Mont. 13 (69 Pac. 115, 94 Am. St. Rep. 811).

3. Having concluded that parol evidence cannot be employed to add a term to a written contract unless it appears from an inspection of the writing interpreted in the light of the circumstances under which it was made, the situation of the subject of the instrument and the parties to it, that the writing is incomplete, it yet remains to determine whether the documents presented here are complete contracts. Turning to the writing signed by the plaintiffs, it will be seen that the Sund partners agree to do the construction work between certain stations and the defendant agrees to pay certain prices for certain kinds of work. It is true that the first paragraph refers to a profile, directions of the defendant, and rules, specifications and instructions given by the chief engineer of the Silver Falls Timber Company, but these provisions relate to the manner of performing the work and are no longer of any moment for the reason that the work has been completed in the manner agreed upon. Every element necessary for a complete contract is found in the writing. Not a word can be found in the instrument which contains the slightest suggestion that the parties agreed that they would be bound by the final estimates of the chief engineer. The writing is utterly

silent upon that subject. It may be true that contracts with stationmen usually contain the stipulation contended for by the defendant but the answer is that this instrument does not contain such a stipulation. The parties chose to reduce their oral agreement to writing and upon inspection the document appears to contain a complete contract. The prior oral agreement made in September, 1912, may have included the stipulation that the parties would be bound by the estimates of the chief engineer; but if the oral agreement did embrace such a stipulation the parties left it out when they reduced the agreement to writing and since the writing now appears to contain a complete contract, the party claiming to be prejudiced is without remedy in this proceeding: *Vogt* v. *Schienebeck,* 122 Wis. 491 (100 N. W. 820, 106 Am. St. Rep. 989, 2 Ann. Cas. 814, 67 L. R. A. 756).

The record as now presented to us does not involve any questions arising out of any asserted custom. The only question we have undertaken to discuss is whether or not the defendant was entitled to show by parol evidence that the parties orally agreed to be bound by the final estimates of the chief engineer; and having found that such parol evidence was incompetent it follows that the defendant was not entitled to a judgment of nonsuit, and consequently the judgment is reversed and the cause is remanded for a new trial.

REVERSED AND REMANDED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BENSON and MR. JUSTICE BURNETT concur.