Argued April 10, affirmed September 19, 1962

# CARD *v.* STIRNWEIS
### 374 P. 2d 472

· *Wilber Henderson,* Portland, argued the cause for appellant. With him on the brief was Barrett Randall, Portland.

*James H. Clarke,* Portland, argued the cause for respondent. On the brief were Koerner, Young, Mc-Colloch & Dezendorf, Portland.

Before McAllister, Chief Justice, and Rossman, Perry and Goodwin, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Don B. Card, from a decree of the circuit court which dismissed this suit. Card, claiming that he had accepted an option signed October 28, 1946, by one V. O. Stirnweis, brought this suit to secure specific performance of the option. The latter authorized Card to purchase at the time of the death of Stirnweis all of the stock which he owned October 28, 1946, in a corporation entitled Crawford & Doherty Foundry Co. On the day just mentioned Stirnweis owned substantially more than one-half of the shares of the stock of that corporation. Stirnweis and Card were the only owners of the shares of stock of the corporation on October 28, 1946. The two men were also at that time the sole officers of the corporation. At that time the relationship between the two was cordial; it manifested mutual trust and confidence. October 28, 1946, when Stirnweis granted to Card the option to purchase all of Stirnweis' stock, Card issued a similar option to Stirnweis. Each option specified the purchase price to be paid by the optionee and each stated, "This option to take effect only in the event of my death." Each option stated that it could be "revoked by giving written notice" to the optionee. By May 20, 1954, the cordial relationship which had existed between the two men had come to a close. On that day, according to the plaintiff-appellant's brief, "Plaintiff, at the request

of V. O. Stirnweis, tendered his resignation which was accepted, and thereafter the parties had no dealings." The resignation to which the quoted words refer was from Card's offices in the corporation as an officer and a director. Later the plaintiff sold all of his shares of stock to Stirnweis. Still later, that is, on July 22, 1960, Stirnweis died. The defendant is his widow and the executrix of his estate. Following her appointment as executrix the plaintiff notified her that he elected to exercise the option. He tendered the needed amount of money and demanded delivery to him of all stock standing in the name of her husband when the option was signed. The defendant rejected the demand. As we have stated, the circuit court sustained the defendant's position.

The plaintiff-appellant's assignment of error follows:

"The Lower Court erred in holding that the option given by V. O. Stirnweis to the plaintiff had been cancelled by implication through the optionee's sale of all his stock in the Crawford and Doherty Foundry Company."

When the plaintiff resigned from his offices in the corporation he did not sell his stock. When the options were issued the plaintiff was the beneficiary in a policy of life insurance which was issued upon the life of Stirnweis. A similar policy in favor of Stirnweis existed upon Card's life. Each option, in specifying the initial payment which the optionee was required to make upon exercising it, said "plus any amount in excess of ten thousand available by reason of insurance upon the life of * * *." That provision renders reasonable the inference that the purpose of the life insurance was to help the optionee

finance the exercise of the option. By May 20, 1954, when Card resigned his corporate offices, the life insurance policies had expired. April 20, 1960, Card sold all of his stock to Stirnweis and thereafter owned none.

Referring to the two options, the plaintiff testified:

"Q You admit, do you not, Mr. Card, that the purpose of those two documents and the purpose of the simultaneous execution was to permit the survivor, as between the two of you, to acquire the stock of the other.

"A Yes.

"Q And it was for the purpose of protecting each of you in the event of the death of the other?

"A Yes."

We have mentioned the facts that (1) Stirnweis owned more than one-half of the stock of the corporation and (2) the option which he signed covered all stock "now standing in my name on the books" of the corporation.

The material part of the option executed by the deceased reads as follows:

"In recognition of the uncertainty of life and the dangers of travel, and in consideration of the sum of one dollar ($1.00) and other valuable considerations, the receipt of which are hereby acknowledged, I V. O. Stirnweis, the undersigned, hereby give unto D. B. Card an option to purchase the capital stock of Crawford & Doherty Foundry Co., an Oregon corporation, now standing in my name on the books of the said corporation for the sum of one hundred thousand dollars ($100,000.00) payable as follows: ten thousand dollars ($10,000.00) in cash upon the exercise of this option, plus any amount in excess of ten thousand

available by reason of insurance on the life of V. O. Stirnweis in favor of D. B. Card as beneficiary, and the balance to be paid at the rate of ten thousand dollars ($10,000.00) annually thereafter, without interest, until paid in full.

"This option to take effect only in the event of my death and to be exercised within thirty days thereafter, and to be binding upon my heirs, successors, or assigns, provided that at any time during my lifetime this option may be revoked by giving written notice to D. B. Card."

Stirnweis accompanied his signature with a seal. Card did the same when he signed his option. A seal "is primary evidence of a consideration," ORS 42.130.

The defendant contends that eligibility to exercise the option was subject to an implied condition that its holder be a shareholder in the corporation at the time of its exercise. She also urges that since the plaintiff divested himself of all of his stock prior to the death of the deceased, and owned no stock in the corporation thereafter, the option was effectively terminated.

To support his assignment of error, which we have quoted, the plaintiff claims that there is no implied condition such as that for which the defendant contends and that it was error for the trial judge to consider the circumstances surrounding the execution of the contract in finding such a condition. The plaintiff contends that a court may not consider the situation of the parties to an instrument, or the circumstances under which the latter was made unless the instrument is ambiguous on its face. He claims that the document in question is unambiguous.

Since the plaintiff bases virtually his entire argu-

ment on this contention, it becomes necessary to consider the following sections of our laws:

ORS 41.740 establishes for this state our parol evidence rule; it says:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute.   *   *   *"

We interrupt the quotation for the purpose of taking notice particularly of the following sentence of the section:

"*   *   *   However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term "agreement" includes deeds and wills as well as contracts between parties."

ORS 42.220, referred to in the above quoted section, reads:

"In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language he is interpreting."

The application of the section of our laws just quoted to the practical affairs of life is well illus-

trated by *Baker County v. Huntington,* 46 Or 275, 79
P 187 (1905), as follows:

> "It is a rule of law that where the language of
> a written instrument is ambiguous, equivocal, or
> susceptible of conflicting interpretations, it is com-
> petent to ascertain the intention of the parties
> thereto from the facts and circumstances which in-
> duced its execution, and thereafter to enforce it
> in accordance with such intention, and such facts
> and circumstances may be shown by parol. It is not
> the office of parol evidence in such case to alter
> the language of the instrument, but to ascertain
> and determine the purposes to which the parties
> intended to apply it. * * * It sometimes hap-
> pens, for the purpose of ascertaining what was in
> the minds of the parties, that it is necessary to
> resort to extrinsic parol proof; and this may be
> done, not for the purpose of altering the terms of
> the writing by words of mouth passing at the time,
> but as a part of the conduct of the parties, in order
> to determine what was the scope and object of the
> intended contract, and to fill up the instrument
> where it is silent. 'Having done that,' says Mr.
> Bradner in his valuable work on Evidence (2 ed),
> 274, 'the court can turn to the language of the
> instrument to see if that language is capable of
> being construed so as to carry into effect that which
> appears to have been really the intent of both par-
> ties. * * *' "

The principles stated in the decision of which we
have just taken notice are in harmony with the law
employed in other jurisdictions. Restatement of the
Law, Contracts, § 230, says:

> "The standard of interpretation of an integra-
> tion, except where it produces an ambiguous result,
> or is excluded by a rule of law establishing a defi-
> nite meaning, is the meaning that would be attached
> to the integration by a reasonably intelligent per-
> son acquainted with all operative usages and know-

ing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean."

Section 235 of the same volume states:

"The following rules aid the application of the standards stated in §§ 230, 233.

\* \* \*

"(d) All circumstances accompanying the transaction may be taken into consideration, subject in case of integrations to the qualifications stated in § 230."

"*Comment on Clause* (d):

"e. The court in interpreting words or other acts of the parties puts itself in the position which they occupied at the time the contract was made. In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement."

Corbin on Contracts, § 579, states:

"It is true that the language of some agreements has been believed to be so plain and clear that the court needs no assistance in interpreting. Even in these cases, however, it will be found that the court has had the aid of parol evidence of the surrounding circumstances. The meaning to be discovered and applied is that which each party had reason to know would be given to the words by the other party. Antecedent and surrounding factors that throw light upon this question may be proved by any kind of relevant evidence."

The principle of the Baker case has never been renounced. *Barnstable v. United States National Bank*,

232 Or 36, 374 P2d 386, decided September 5, 1962, does not conflict with the holding just quoted. It dealt with a contract partly written and partly oral. The latter was supplementary to the written part and did not impinge upon it.

The purpose of ORS 41.740 and 42.220 in placing the judge in the position of the parties whose writing he is endeavoring to understand is like the act of a person who, upon seeing another studying a photograph of an individual from which the background has been cut away, hands to the person the background part so that he may restore the mutilated photograph and see the picture as it was when the camera was snapped.

The restoration of the background to the mutilated photograph does not alter or change a single line or part of the photograph, but it may enable the one viewing the photograph to discern more clearly what is represented by it.

In the case at bar the circumstances that surround the execution of the two option agreements, as viewed in the light of *Baker County v. Huntington,* supra, were: the plaintiff and the deceased were the only shareholders of the corporation, they were the only officers, they anticipated a continuance of the pleasant relationship between them that then prevailed, and in issuing the options their purpose was, so the plaintiff testified, to afford the survivor protection in his ownership of stock.

When we consider the options in the light of the surrounding circumstances, we have the situation to which we will now proceed.

At the time the option was executed the deceased was the majority shareholder in the Crawford & Doherty Foundry Company. The plaintiff held all of

the remaining shares. Both were active in the business, serving as executives. It is typical of close corporations that the shareholders are in intimate contact with one another. Each becomes aware of the business ability of the other, and the ability of each is vital to the successful operation of the corporation. See 1 O'Neal, Close Corporations, p 13, Sec. 1.07. So in this company both the plaintiff and the deceased played important roles in the conduct of its affairs.

It is understandable that persons engaged in an operation such as the plaintiff and the deceased conducted would wish to retain power to determine who should become owner of the stock of his associate upon his death. The option which each of these two men gave to the other would enable the survivor with the help of the insurance money and the deferred payment plan for which the options made provision, to acquire the deceased's stock if the survivor felt that the deceased's widow, heirs, or legatees would not be suitable future associates. Naturally, a surviving stockholder wishes to prevent the entry into the business of persons whose business judgment he mistrusts, or with whom he believes he could not work harmoniously. Possibly he may desire to guard against the sale by an heir or devisee of shares to competitors or others unfriendly to the corporation and whose aim would be to destroy rather than to build. *Mason v. Mallard*, 213 Iowa 1076, 240 NW 671 (1932); *Casper v. Kalt-Zimmers Mfg. Co.*, 159 Wis 517, 149 NW 754, 150 NW 1101 (1914); *Model Clothing House v. Dickinson*, 146 Minn 367, 178 NW 957 (1920). Apparently Holmes, C. J., was thinking of those factors when he stated in *Barrett v. King*, 181 Mass 476, 63 NE 934 (1902), that:

"* * * Stock in a corporation is not merely

property. It also creates a personal relation analagous otherwise than technically to a partnership. \* \* \* there seems to be no greater objection to retaining the right of choosing one's associates in a corporation than in a firm. \* \* \*"

The options which Card and the deceased signed afforded the optionee, upon becoming the survivor, opportunity to prevent any stock from falling into the hands of a legatee or an heir whom the survivor believed would not be an agreeable associate. Likewise, the option afforded the survivor opportunity to gain 100 per cent control of the corporation by exercising the option. A surviving stockholder who believed that an heir or legatee would not be a satisfactory stockholder or would sell his stock to a competitor, by exercising the option, could prevent the unfavorable development from occurring.

It is clear, then, why shareholders in close corporations engage extensively in the restriction of stock transfers. The giving of a stock option to a prospective surviving shareholder to be exercised upon the death of the optionor is, as we have just seen, an effective method whereby the survivor can prevent an unsatisfactory heir or distributee from sharing with him in the future conduct of the business. An option of that kind enables the survivor to purchase, at the price fixed by the deceased, the stock that would otherwise descend to the heir or legatee. Thus, the option gives him a sort of veto power over the heir or legatee.

It is in such a setting that the execution of the option in plaintiff's favor occurred. And it is in that setting that the option must be considered. Otherwise, the avowed purpose of determining the purpose of the parties becomes mere verbiage. When the document before us is considered upon that background

it becomes apparent that the parties had a purpose which they did not put fully into writing. The question to be resolved is whether, when the purpose of giving the option was to protect the survivor from encroachment by outside interests, the parties to the option intended that an outsider such as the plaintiff had become could exercise the option.

*Pinnacle Packing Co. v. Herbert,* 157 Or 96, 70 P 2d 31, quoted approvingly the following:

"Necessary implication is, beyond doubt, as much a part of an instrument as if that which is so implied were plainly expressed. If it can be plainly seen from all the provisions of the instrument taken together, that the obligation in question was within the contemplation of the parties when making their contract, or is necessary to carry their intention into effect—in other words, if it is a necessary implication from the provisions of the instrument—the law will imply the obligation and enforce it. The policy of the law is to supply in contracts what is presumed to have been inadvertently omitted by the parties, the parties being supposed to have made those stipulations which as honest, fair and just men they ought to have made. Therefore, whatever may fairly be implied from the terms or nature of an instrument is, in judgment of law, contained in it."

The following is quoted from *Sacramento Navigation Co. v. Salz,* 273 U S 326, 47 S Ct 368, 71 L Ed 663 (1927):

"* *. * But a contract includes not only the promises set forth in express words but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made * * *."

*Upper Columbia River Towing Company v. Glens Falls Insurance Company,* 179 Fed Supp 705, ruled:

"Every contract includes such implied provisions as are indispensible to effectuate the intention of the parties. \* \* \*"

We take the following from 17 CJS, Contracts, § 328, page 778:

"A contract includes not only what is expressly stated but also what is necessarily to be implied from the language used; and terms which may clearly be implied from a consideration of the entire contract are as much a part thereof as though plainly written on its face. In the absence of an express provision therefor, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made \* \* \*."

Williston on Contracts, revised edition, § 1293, states:

"It is not only for breach of express promises that a contractor is liable but of implied promises as well; and the most serious difficulty in this matter is to determine what promises are fairly to be implied in a given contract. The principle to be adopted, however, is plain; the difficulty lies in its application. Since the governing principle in the formation of contracts is the justifiable assumption by one party of a certain intention on the part of the other, the undertaking of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included."

We take the following from Corbin on Contracts, § 632:

"A fact or event may be a condition of a contractual right or duty, even though the parties had

no intention that it should so operate, said nothing about it in words, and did nothing from which an inference of intention can be drawn. When such is the case, the condition is one that can be described as neither an express condition nor an implied condition. Such a fact or event will be called herein a constructive condition. It is operative as a condition for the reason that courts have held or will hold it so on grounds of justice that are independent of expressed intention. Frequently, however, the holding of the court will be so stated as to make it appear that it is based upon a 'presumed' intention or even upon actual intention that is discovered by some mysterious kind of interpretation or inference. * * *

"Suppose that A contracts to render personal service for B for a period of one year. Neither party thinks of the possibility that A will be stricken with an incapacitating illness; and A's promise to serve is absolute and unconditional in form. A's duty to serve will be held to be conditional upon the existence of a reasonable degree of physical health. By construction of law, it is a condition of A's duty to serve. * * *"

We will revert for a moment to the circumstances under which the options were signed. The plaintiff became a minority shareholder in the corporation at its inception in 1927. The relationship between the two men in this earlier period was satisfactory, for in addition to being the only stockholders in this corporation they became engaged in a joint venture of an undisclosed nature which was independent of the foundry. That venture also was terminated when their cordial relationship came to an end and the plaintiff resigned his offices in the corporation. The foregoing warrants a belief that the two men felt that if they could continue to control and administer the policy of

the corporation, its promising outlook would extend into the future. To that end the stock options were executed. No one claims that their purpose was to enable the survivor to purchase the deceased's stock at a low price to the disadvantage of the widow, but, as we saw through quotation of testimony given by the plaintiff, their purpose was protection for the survivor, more particularly, the protection of his interest in the business.

Clearly these agreements would never have been entered into in the absence of cordial relations, mutual trust and confidence. Nor would they have been executed if the parties had thought that the then existing relations would cease. It is apparent that the agreements contemplated the continued existence of the friendly relationships as a condition to their fulfillment. We must never forget that both options looked forward for a period of possibly many years into the distant future, for each option stated that it was "to take effect only in the event of my death." The purpose of each option was the protection of the survivor in his ownership of his stock and his future conduct of the business. Therefore, they contemplated continued ownership of shares in the corporation as a prerequisite to exercise of the options. For unless the optionee held some stock in the corporation he had nothing to protect.

The evidence which is reviewed in preceding paragraphs shows that when the plaintiff and the deceased signed the two option agreements they did not anticipate that their friendship would end, that Stirnweis would lose confidence in the plaintiff, that the latter would cease being an officer in the corporation and would sell all of his stock to Stirnweis. When the options were given both were officers in the corporation

and both were shareholders. The purpose of the options was the protection of shares owned by the survivor. Thus, they took it for granted that the survivor would be a shareholder. They assumed, when they signed the options, that both would be shareholders when the first of them died. The evidence of which we have taken notice convinces us that whether they uttered words to that effect or not they intended that each optionee should continue to be a shareholder in order to be eligible to purchase the stock of the deceased shareholder.

When the plaintiff sought to exercise the option he owned no stock in the corporation. He was, therefore, not eligible to exercise the option. He had terminated it when he sold his stock.

Plaintiff contends that because the option makes provision for its revocation by giving him written notice, all other methods of revocation are excluded. We find this contention without merit. The provision to which plaintiff refers permits that particular method. It does not imply in any way that that method is intended to be exclusive.

The decree of the circuit court is affirmed. Costs and disbursements will be allowed to neither party.

Justice GOODWIN concurs in this opinion.

Chief Justice MCALLISTER and Justice PERRY concur in the result.