Argued and submitted November 13, 1985, resubmitted In Banc July 9, reversed and remanded September 10, U. S. National's reconsideration denied November 7, Paul Schatz Furn. Co's reconsideration allowed by order December 30, 1986, U. S. National's petition for review denied January 6, 1987 (302 Or 476)

JARRETT et al,
*Appellants,*

*v.*

UNITED STATES NATIONAL
BANK OF OREGON et al,
*Respondents.*

(A8205-02951; CA A32549)

725 P2d 384

James H. Clarke, Portland, argued the cause for appellants. With him on the brief was Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland.

Charles F. Hinkle, Portland, argued the cause for respondent United States National Bank of Oregon. With him on the brief was Stoehl, Rives, Boley, Fraser & Wyse, Portland.

James C. Maletis, Portland, argued the cause and submitted the brief for respondents Paul Schatz Furniture Co. and Paul Schatz, Jr.

WARREN, J.

## WARREN, J.

Plaintiffs, two of the residuary beneficiaries of a trust which has terminated, commenced this action for breach of trust, seeking declaratory relief and damages. They claim that defendant United States National Bank breached its duty as trustee by imprudently renewing a lease of real property, which was the principal trust asset, and by failing for seven years to require payment of a demand note which was also a trust asset. The trial court concluded that the trustee acted prudently and did not breach its duty and entered judgment for defendants. Plaintiffs appeal. We review *de novo*.

Paul Schatz (Senior) was the settlor of the *inter vivos* trust which this case concerns. The trust was created on March 12, 1971, and was funded with 403 shares of stock in Senior's business, the Paul Schatz Furniture Company (Company), and the real property and furniture store building on N. E. 41st Avenue in Portland. Senior reserved the right to receive payments of income and to withdraw principal from the trust during his life as he directed. He executed a will on the same date as the trust. The will left Senior's personal effects to his wife, his shares of stock in Company to his son, Paul Schatz, Jr. (Junior), and the residue to the trust. The trust provided that, after Senior's death, Junior was to receive the remaining shares of stock in Company and the trustee was to pay to Senior's wife all the income from the remaining assets and had authority to invade the principal to maintain her standard of living. After the wife's death, the trustee was to distribute all the real property to plaintiffs, Senior's two daughters, and to distribute the rest of the trust corpus equally among those two daughters and his son.

Shortly after executing the trust and the will, Senior executed a lease of the real property to Company. The lease was pre-dated to July 1, 1970, was for a five-year term and reserved a rent of $2,100 per month. The lease gave the lessee "four five-year successive options to renew this lease for an additional five years each upon the same terms and rental payments" upon giving the lessors written notice of intent to renew at least 120 days before the termination of the lease period. It also provided that "[t]ime and the punctual and exact performance and observance * * * of the conditions herein contained are of the essence of this lease." The lease

also gave the lessee the right of first refusal if the lessors received an offer to purchase the building.

Another trust asset was a promissory note payable on demand for $36,548.98, dated March 1, 1971, from Company to Senior, which bore interest at seven per cent per year on the unpaid balance. After Senior's death in October, 1973, the lease and interest on the note were the sole sources of his widow's income from the trust. She died on August 31, 1980.

Plaintiffs first claim that the circumstances under which the trustee permitted Company to renew the lease in 1975 involved a breach of the trustee's fiduciary duty. Company and Junior are also named as defendants in this action. The original lease term of five years expired on June 30, 1975, and Company had until March 2, 1975, to give written notice of its intent to exercise its option to renew the lease. The bank did not receive that notice, and on June 11, 1975, the bank's real estate trust officer first discovered the renewal option and became aware that Company had not yet exercised it. He then contacted Junior, informed him that the time to exercise the option had passed, and asked him to exercise the option. Junior did exercise the option for Company, by letter dated June 16, 1975. The trustee made no effort to renegotiate or terminate the lease, as it could have done because the lessee did not comply with the 120-day notice condition of the renewal option. Defendant's trust officer testified that, before renewal, he had evaluated the reasonableness of the rent based on the return on investment and on comparable properties' rentals and concluded that it was reasonable. He did not recall if he had conducted this evaluation before or after he contacted Junior.

Plaintiffs claim that the trustee breached its duties of prudent management[1] and loyalty by failing to test the market to determine if it could obtain a lease which was more favorable to the beneficiaries when it had the opportunity.

---

[1] ORS 128.057(1) provides, in pertinent part:

"In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property for the benefit of another, a fiduciary shall exercise the judgment and care under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital."

They introduced evidence that the market rent for the premises was $3,340 per month on June 1, 1975. The trustee conceded, in closing argument, that $2,100 was below market value, but argued that it effectuated the settlor's intent by waiving the 120-day notice requirement and renewing the lease. In order to establish the settlor's intent, Bank offered double hearsay concerning Senior's intent to perpetuate his business after his death. Plaintiffs assign error to the admission of this statement, to the court's finding that the settlor intended that Company operate at the same location with the same rental for the entire 25 years of the lease and to the court's concluding that Bank did not breach its fiduciary duties in renewing the lease.

When a will or a trust instrument is fully integrated and is not ambiguous on its face, extrinsic evidence is not admissible to establish the testator's or settlor's intent. *Roehr v. Pittman,* 256 Or 193, 472 P2d 278 (1970); *Rowe v. Rowe, et al,* 219 Or 599, 608, 347 P2d 968 (1959); *Allen v. Hendrick,* 104 Or 202, 212, 206 P 733 (1922). The trust instrument on its face was not ambiguous and did not indicate any purpose of Senior to favor Company. Bank argues that the trust and the lease were silent as to what Senior intended the trustee to do if the lessee failed to give the 120-day notice of renewal and that extrinsic evidence is admissible to establish his intent in this case. We do not agree. The lease unequivocally stated that "[t]ime and the punctual and exact performance * * * of the conditions * * * are of the essence of this lease." The instruments do not indicate that the settlor intended the trustee to be lenient with regard to waiving the notice condition. If anything, they indicate the opposite. Because the instruments are not ambiguous as to the consequence of failure to comply timely with the lease conditions, extrinsic evidence as to the settlor's contrary intent is not admissible.

The dissent argues that the extrinsic evidence is admissible to put the court in the position of the settlor to ascertain his intent. The court has no occasion to put itself in the settlor's position when it construes a fully integrated, unambiguous trust document, because the intent of the settlor can be ascertained from the face of the document. ORS 42.220 and ORS 41.740 permit a court to consider the circumstances surrounding the execution of an agreement *only* when the agreement is ambiguous on its face or is not fully integrated.

*Bonded Credit Co. v. Hendrix,* 282 Or 35, 576 P2d 795 (1978); *Webster et ux v. Harris,* 189 Or 671, 677-78, 22 P2d 644 (1950). Resort to extrinsic evidence to make an unambiguous document ambiguous is not permissible, but that is the sole purpose of the dissent's resort to it in this case. *See Sund & Co. v. Flagg & Standifer Co.,* 86 Or 289, 299, 168 P 300 (1917).

The three cases that the dissent cites for the proposition that, regardless of whether the writing is ambiguous, extrinsic evidence relating to the circumstances surrounding the execution of the documents is admissible, 81 Or App at 251, do not support that position. In two of them, the court held that the documents it construed *were* ambiguous. *Welch v. U. S. Bancorp,* 286 Or 673, 690, 596 P2d 947 (1979) ("The contract is not unambiguous."); *Taylors Coffee Shop v. Taylor,* 56 Or App 419, 424, 643 P2d 347, *rev den* 293 Or 235 (1982) ("[T]he escalation clause was ambiguous.") Any language in those cases to the effect that a court may consider extrinsic evidence in construing an unambiguous contract is pure *dictum.* In *Card v. Stirnweis,* 232 Or 123, 374 P2d 472 (1962), the court considered an unambiguous, but only partially integrated, contract. The contract there did not address the disputed issue of whether the optionee had to be a shareholder at the time he exercised an option to purchase more stock. Because the agreement was only partially integrated, the court considered extrinsic evidence to determine what the parties would have agreed to in the situation that arose in order to supply the omitted term. None of the cases supports the dissent's position that extrinsic evidence is admissible to construe a fully integrated, unambiguous document, as in this case.[2]

■　　In the absence of any specific directions, trustees must manage trust property in accordance with the statutory duty of prudent management and in the best interests of the beneficiaries. When Company failed to exercise its option

---

[2] *Truax and Truax,* 62 Or App 130, 133, 659 P2d 983 (1983), contains the statement that "an agreement need not be ambiguous to admit evidence of the surrounding circumstance to aid in its interpretation and meaning." However, it relies for that proposition on the three cases we have already distinguished. Even if the evidence is admissible to place the court in the position of the settlor, here the dissent uses the extrinsic evidence to avoid the time-essence clause, thus altering the effect of the express terms of the instruments. That is an impermissible use when, as here, the documents are unambiguous.

timely, the trustee was obligated to determine the market rental of the property either by appraisal or by testing the market. *Hatcher v. U.S. Nat'l Bank,* 56 Or App 643, 652-53, 643 P2d 359, *rev den* 293 Or 373 (1982). We do not think that the trustee fulfilled its duty in this case but, instead, took the easiest course by permitting the lessee to renew the lease, which locked up the property at the below market rental possibly for another 20 years. The trustee's assertion that it did evaluate the lease before renewal is equivocal and its claim that it sought to effectuate the settlor's intent seems to be an after-the-fact rationalization. The trustee did not even discover the existence of the option until June 11, 1975, long after the right to exercise it had expired. The trustee's employe called Junior and asked him to exercise it, which Junior did on June 16, 1975. The trustee breached its fiduciary duty by waiving the notice provision and offering to renew the lease without attempting to negotiate a rental more favorable to all the beneficiaries or even to consider that option.

■ Plaintiffs, who now have title to the property, request that the lease be rescinded as a result of the trustee's breach. A contract made between a trustee and a third party can be rescinded if the third party "knows or should know of the existence of the trust and that the trustee is committing a breach of the trust in making the lease." III *Scott on Trusts* § 189.1, 1539-40 (3d ed 1967).

> "A third person has notice of a breach of trust, although he does not have actual knowledge of it, if he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the person with whom he is dealing is a trustee and, if he is, whether he is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust. * * *

> "Whether a person who deals with another who is in fact a trustee is under a duty to inquire whether he is a trustee and whether he is committing a breach of trust in making the transfer, and if so to what extent inquiry should be made, depends upon the circumstances." IV *Scott on Trusts,* § 297, 2405-06 (3d ed 1967).

*See also Clearwater v. Wagner,* 272 Or 491, 496, 537 P2d 532 (1975).

We do not think that Company should be charged with knowledge that the trustee breached its duty in waiving the notice requirement under the circumstances of this case. First, in this case the trustee did not make the lease; the grantor made the lease which gave Company significant advantages. The trustee only permitted Company to renew the lease despite its having failed to give timely notice. Because the trustee's role was more minor than had it created the lease, Company could reasonably think that the trustee's conduct was proper. Second, Junior, president of Company, testified that he did not know how the figure of $2,100 was originally determined or how it compares with other rents in the area. He also testified that he would not have gone along with a rent increase, had the trustee proposed one. Third, there was evidence that, if Company did not renew, the property might have been difficult to rent and could have been vacant for up to one year. Extensive remodeling would have been required to lease the premises to other than a furniture company. The information with which Company was faced justifies different inferences as to the prudence of the trustee's acts, and Company could plausibly have inferred that the trustee was acting in the beneficiaries' best interests by waiving the notice requirement. Because we cannot say that Company should have known of the trustee's failure to consider options other than renewing the lease, we deny the beneficiaries a rescission of the lease. The trustee is, however, liable for damages which the beneficiaries have suffered and will suffer in the future, and we remand for a determination of those damages.

■     Plaintiffs claim the trustee committed a second breach of trust by failing to demand payment on the aforementioned promissory note after interest rates rose above seven per cent. The note became a trust asset after Senior died in October, 1973. Evidence showed that the bank's prime lending rate surpassed seven per cent in September, 1977, and reached 10 per cent in October, 1978, 12 per cent in August, 1979, and rose to 20 per cent in April, 1980. The trial court admitted hearsay offered to show that Senior would not have wanted the trustee to collect the demand note and found that the bank was prudent in failing to demand payment until September, 1980. Plaintiffs assign these rulings as error.

Extrinsic evidence of the settlor's intent was not

admissible, because the trust instrument was not ambiguous with regard to the trustee's duty in managing the asset. The trust instrument specifically authorized the trustee to realize upon any promissory note and did not indicate any intent of the settlor not to have the trustee demand payment. Prudent investment management would call for the trustee to demand payment on the note as soon as it could realize a return on this asset which was greater than seven per cent. The trustee breached its fiduciary duty by failing to demand payment on the note after September, 1977, and is liable to the beneficiaries for the lost income to the trust.

The dissent argues that plaintiffs' damages were *de minimis* from what it concedes was a breach of defendant's fiduciary duty. The note was a trust asset, and the trustee's failure to make that asset more productive harmed all of the beneficiaries. If the trustee had called the note and reinvested it more productively, it would have increased both the value of the corpus and the trust's income. An increase in the corpus clearly is a direct benefit to the residuary beneficiaries. An increase in the trust's current income would also provide at least an indirect benefit to plaintiffs in that it would reduce the potential need to invade the corpus to provide for the widow's needs. The entire trust and all the beneficiaries would have benefitted from the trustee's demanding payment on the note earlier, and plaintiffs were sufficiently damaged to hold the trustee responsible for the breach of trust.

Reversed and remanded for a determination of plaintiffs' damages.

**BUTTLER, J.,** dissenting.

Because the majority erroneously closes its eyes to the circumstances surrounding the execution of the lease, the trust and the will and, by doing so, reaches the wrong result, I dissent.

It is not clear why the majority finds error in the court's considering the circumstances surrounding the execution of the documents, because no error is assigned[1] to the

---

[1] The witness testified that the attorney told him that one of Senior's objectives in establishing the trust was to perpetuate the furniture business and to permit Junior to continue it after Senior's retirement or death. He also testified with respect to the demand note that, after he had consulted with Senior's attorney, he had made a

admission of that evidence, some of which came from plaintiffs' testimony. Having decided to find error on its own, it *creates* error in stating: "ORS 42.220 and ORS 41.740 permit a court to consider the circumstances surrounding the execution of an agreement *only* when the agreement is ambiguous on its face or is not fully integrated." 81 Or App at 246. *Webster et ux. v. Harris,* 189 Or 671, 22 P2d 644 (1950), on which the majority relies, is the only case that comes close to stating so broad a proposition, and it has not been followed in that respect.

To the contrary, ORS 41.740, the parol evidence rule, expressly provides that the rule "does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, * * *." ORS 42.220 provides:

> In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting."

The two statutes have consistently been held to mean what they say, excepting the language in *Webster et ux. v. Harris, supra. Welch v. U.S. Bancorp,* 286 Or 673, 690, 596 P2d 947 (1979); *Card v. Stirnweis,* 232 Or 123, 374 P2d 472 (1962); *Truax and Truax,* 62 Or App 130, 659 P2d 983 (1983);[2] *Taylors Coffee Shop v. Taylor,* 56 Or App 419, 643 P2d 347, *rev den* 293 Or 235 (1982).

In *Card v. Stirnweis, supra,* the court stated:

> "The purpose of ORS 41.740 and 42.220 in placing the judge in the position of the parties whose writing he is endeavoring to understand is like the act of a person who, upon seeing another studying a photograph of an individual from which the background has been cut away, hands to the person the background part so that he may restore the

---

handwritten notation on the note that the trustee was not to require any principal payments, only interest, in order to give Junior "some relief in cash flow." The trial court, apparently, relied in part on that testimony. On my *de novo* review, I do not consider it.

[2] In *Truax and Truax,* 62 Or App 130, 659 P2d 983 (1983), we held that the two statutes, read together, expressly permit extrinsic evidence for the purpose for which we consider it, even though the agreement was unambiguous and was fully integrated. I do not consider that evidence to create an ambiguity, as the majority states; neither do I consider it to vary the terms of the three documents read together.

mutilated photograph and see the picture as it was when the camera was snapped.

"The restoration of the background to the mutilated photograph does not alter or change a single line or part of the photograph, but it may enable the one viewing the photograph to discern more clearly what is represented by it." 232 Or at 131.

In *Kennedy et al v. Colt,* 216 Or 647, 658, 339 P2d 450 (1959), the court said that "such evidence is always admissible to apply a writing to its subject."

It is clear that extrinsic evidence of the circumstances surrounding the execution of the three documents is admissible, not for the purpose of contradicting their terms or for the purpose of creating an ambiguity, but for the purpose of determining whether the trustee violated its duty under ORS 128.057 when all of the documents, executed contemporaneously, are read together, as the parties agree they should be, in the light of all of the surrounding circumstances. Accordingly, I will set forth some of the circumstances in order to complete the picture that the majority says cannot be considered.

Paul Schatz, Sr. (Senior) began his furniture business in 1920, and in 1939 he purchased and moved to the building on the property involved in these proceedings, located on N.E. 41st Avenue in Portland's Hollywood District. The business has continued to operate at that location in the same building to the present. In the mid-1960s, although Senior remained as president of the company, Paul Schatz, Jr. (Junior) took over the day-to-day operations. Senior continued to come to the store every day until his death in October, 1973.

On March 12, 1971, Senior created an *inter vivos* trust, which was funded with 403 shares of stock in the Paul Schatz Furniture Company and the real property and furniture store building on N.E. 41st Avenue. The trust provided that, after Senior's death, Junior was to receive those shares of stock in the company and the trustee was to pay to Senior's wife all of the income from the remaining assets, with authority to invade the principal in order to maintain his wife's standard of living as it existed at the time of his death. Under his will, executed the same date as the trust, his personal

property was left to his wife, all of his shares of stock not already in the trust were left to Junior, and the residue was left to the trustee to be administered under the terms of the *inter vivos* trust. After Senior's wife's death, the trustee was directed to distribute all of the real property then in its possession to plaintiffs (Senior's two daughters) and to distribute the rest equally among those two daughters and Junior.

Shortly after he executed the will, Senior executed a lease of the real property to the furniture company. The lease provided for an initial term of five years, with four successive options to renew for an additional five years each, on the same terms and rental, by giving the lessor written notice of intent to renew at least 120 days before the termination of the lease period. It also provided that "[t]ime and the punctual and exact performance and observance * * * of the conditions herein contained are of the essence of this lease." The rent was fixed at $2,100 a month, and there is evidence that the fair market rent of the property on July 1, 1970, was $2,870. The lease also gave the company a right of first refusal if the lessor received an offer to purchase the property.

Another trust asset was a demand promissory note for $36,548.98, dated March 1, 1971, from the company to Senior, bearing interest at a rate of 7 percent. After Senior's death, the lease and interest on the note were the major sources of his widow's income from the trust; the only other income she received was from Social Security. She died on August 31, 1980.

Plaintiffs claim that the circumstances under which the trustee permitted the company to renew the lease in 1975 involved a breach of the trustee's fiduciary duty. The original lease term of five years expired on June 30, 1975, and the company had until March 2, 1975, to give written notice of its intent to exercise its renewal option. On June 11, 1975, the bank's real estate trust officer first discovered the renewal option and became aware that the company had not yet exercised it. He contacted Junior, informed him that the time to exercise the option had passed and asked him to exercise it. By a letter dated June 16, 1975, the company exercised the option. The trustee made no effort to renegotiate or terminate the lease, as it could have done, because the company had not

complied with the 120-day notice condition of the renewal option. The bank's trust officer testified that, prior to renewal, he had evaluated the reasonableness of the rent, based on the return on investment and comparable rentals, and had concluded that it was reasonable.

Plaintiffs claim that the trustee breached its duties of prudent management and loyalty by failing to test the market to determine if it could obtain a lease that was more favorable to the beneficiaries. They introduced evidence that the market rent for the premises was $3,340 per month on June 1, 1975. The trustee conceded, in closing argument, that $2,100 was below market value but argued, among other things, that it had carried out the settlor's intent by waiving the 120-day notice requirement and renewing the lease. Much of the argument on appeal revolves around what the trustor's intent was with respect to the trustee's waiving the timeliness of the notice to renew the lease. As the majority points out, belaboringly, the lease provisions are clear and unambiguous: if the company did not give timely notice to renew, the trustee had the clear right to terminate the lease. Nothing in the lease, however, requires termination; the timely notice provision, including the time-essence clause, could be waived by the trustee. The relevant inquiry here is whether the trustee violated its fiduciary duty in waiving timely notice, considering the trust and the will and the circumstances surrounding the execution of all of those documents. I do not read the lease in a vacuum, as does the majority.

In viewing the three documents together in the light of the circumstances in which they were executed, it becomes apparent that Senior, who had devoted most of his life to his furniture business, wanted his son to own the business; his son had taken over its operation and was given all of the stock on Senior's death. In addition, he wanted his son to be able to continue to operate it at its then location for 25 years, if he wanted to do so, at a reasonable rental, even if it was less than the market rental. Senior did not lock the company into a 25-year lease; the lease term progressed in five year increments, permitting termination at the end of any one of them. It is true that the continuation of the lease depended on the company's giving notice to renew within a specified time rather than on its giving notice to terminate; however, that fact does not detract from Senior's general intention, as I view it. That

intention is buttressed by the fact that, even though the trustee had authority to sell the property, the company was given the right of first refusal.

It is also apparent that Senior wanted his wife to be able to maintain the standard of living that she enjoyed at the time of his death. To achieve that purpose, and to attempt to preserve as much as possible of his estate for his three children after his wife's death, his will and trust were prepared with an eye to taking advantage of the marital deduction. He directed that his wife receive all of the income from the trust, which was derived from the rental payable under the lease and from the interest payable on the demand note. The only other income available to his wife was from Social Security. If all of that income was insufficient to maintain the widow's standard of living, the trustee was authorized to invade the corpus.

When the original lease term expired on June 30, 1975, Senior's widow was still alive and the trustee had a duty to provide her with trust income, as well as a duty to preserve the trust corpus for the remaindermen. The record shows that, by 1970, the Hollywood District was well into a decline as a retail center. The decline had begun when the Lloyd Center was built in 1959. By the time the renewal option had to be exercised, the Schatz furniture business had expanded into Lake Oswego by merging with Ferguson's in 1970 and by building a large new furniture store in Tualatin in 1974. The gross sales of the N.E. 41st Avenue store were on the decrease in 1975 from the prior year.

Plaintiffs assert that, when the trustee realized that Junior had not given a timely notice of his intent to renew the lease in 1975, it should have notified Junior that the lease was terminated and should have attempted to negotiate a new lease at a higher rental after testing the market. If we consider only the lease and disregard all of the circumstances in which the three documents were executed, perhaps that would be the correct conclusion. However, Senior's widow was still alive. The building is characterized as one for a single use, because it was a multi-story building with no windows above the main floor. If the trustee had threatened Junior with termination of the lease in an effort to renegotiate the rent, it was by no means certain that Junior would have agreed to a higher rent, given the business' recent expansion into newer, growing

areas and the decrease in sales at the Hollywood District store. He testified that he would not have paid any additional rent. If the trustee had terminated the lease and Junior had not agreed to pay a higher rent under a new lease, the principal source of income on which Senior's widow relied would have been cut off. The trustee would have been left with a vacant, single-use building. Furniture stores were moving out of the Hollywood District, not moving in. It would have been very expensive to renovate the building for other uses, and the trust assets were not sufficient for that purpose.

It is apparent that the principal purpose of the trust was to provide income to Senior's widow. If the trustee had failed to bring about a renewal of the lease, it was highly probable that the income would have been interrupted for an indefinite period of time and might have required the trustee to expend what principal amounts it had on hand to renovate the building or might have forced the trustee to sell the building in order to provide the widow with the income necessary to maintain the standard of living to which she was accustomed at the time of Senior's death, as the trust agreement required that it do. By waiving the time-essence clause in the lease,which it had the right to do, and encouraging the company to renew the lease, those problems were avoided.

The trustee had a duty to

> "exercise the judgment and care under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital." ORS 128.057.

That standard is an objective one, and there is no breach if the trustee's decision, under all of the "circumstances then prevailing," meets the standard, even though the trustee does not at the time articulate all of the appropriate bases for doing what it did. Here, the trustee did not fail to perform in accordance with that standard when, given the alternatives which it then had, it took steps to assure that the lease with the company would be renewed and the trust income flow continued. There is always some friction, at least theoretically, between the life income beneficiaries of a trust and the remaindermen, and the trustee has a duty of loyalty to

both. To protect one group may hurt the other; a delicate balancing is required. I cannot say that the trustee breached that duty here by preserving the widow's income when to do so might have decreased the value of the property to the remaindermen. If the trustee had not done what it did, the corpus of the trust might have been depleted more than plaintiffs claim that it has been as a result of the trustee's action.

Plaintiffs also claim that the trustee breached its fiduciary duty by failing to demand payment on the promissory note after interest rates rose above 7 percent. Evidence showed that the bank's prime lending rate exceeded 7 percent in September, 1977, reached 10 percent in October, 1978, 12 percent in August, 1979, and rose to 20 percent in April, 1980. I agree that, at some point, the trustee should have insisted that the company pay the market rate of interest or pay off the note. However, so long as Senior's widow was alive, she was entitled to all of that interest income; plaintiffs had no basis for complaining, and the widow never did. Within one month after the widow's death, the trustee called the note, and the trust assets were distributed to Senior's three children, including plaintiffs.

Although there may be theories under which plaintiffs could claim that they were damaged (and the majority has concocted one[3]), the only evidence that plaintiffs adduced to show damage is that the trust income would have been between four and five thousand dollars greater if the note had been paid off in June, 1975 (instead of in September, 1980) and renewed from time to time at the market rate.[4] Because the widow would have been entitled to all of the income, plaintiffs were not damaged, except for the one month following the widow's death. I consider that damage to be *de minimis*.

I would affirm; therefore, I dissent.

Young and Rossman, JJ., join in this dissent.

---

[3]Apparently, the majority would permit plaintiffs on remand to prove damages on the theory adopted by the majority, rather than on the theory on which the case was tried and argued here. That is a novel approach.

[4]In making his computation, plaintiffs' expert used an average of 10 or 11 percent, somewhere between the prime rate and the lower daily average rate on prime commercial paper with 90-119 days maturity.