Argued and submitted January 8, affirmed July 18, 1990

John Martin EDWARDS,
*Appellant,*

*v.*

TIMES MIRROR COMPANY,
Publishers Paper Co. and Smurfit Newsprint Corp.,
*Respondents.*

(88-2013; CA A51004)

795 P2d 564

A. E. Bud Bailey, Tualatin, argued the cause for appellant. With him on the briefs was Bailey and Kamsky, Tualatin.

Jeffrey M. Batchelor, Portland, argued the cause for respondents. With him on the brief was Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard, Portland.

Before Buttler, Presiding Judge, and Joseph, Chief Judge, and Rossman, Judge.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiff appeals from a summary judgment for defendants Publishers Paper Co. (Publishers) and Smurfit Newsprint Corp. (Smurfit)[1] on his claim for breach of an oral employment agreement for a "stay bonus" and additional severance pay. With respect to his claim for a "stay bonus," the trial court concluded that, as a matter of law, a contract was never formed or that, if one had been formed, plaintiff had settled any claim that he might have had. On his claim for additional severance pay, the trial court held that there was no evidence of an agreement or that plaintiff was aware of a company policy that would entitle him to it.

We assume, without deciding, that the parties entered into a binding employment contract and that plaintiff carried out his obligations thereunder. However, we conclude that plaintiff settled whatever claim he had for a "stay bonus" and that, under the assumed contract, he was not entitled to additional severance pay. Accordingly, we affirm.

 Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. ORCP 47; *Seeborg v. General Motors Corporation,* 284 Or 695, 699, 588 P2d 1100 (1978). On appeal, we review the record in the light most favorable to plaintiff and draw all reasonable inferences in his favor. *Uihlein v. Albertson's, Inc.,* 282 Or 631, 634, 580 P2d 1014 (1978).

Plaintiff was employed at will by Publishers, a wholly owned subsidiary of defendant Times Mirror Company (Times). He was the plant supervisor for the Tillamook sawmill until his termination on January 31, 1987. In July, 1985, Drake, Publisher's vice president, informed plaintiff that Times was contemplating selling its wood products division. During that meeting, Drake asked plaintiff if he would be interested in staying with the company in its paper mill if the wood products division were sold. Plaintiff responded that "if that meant keeping a job[, he would] certainly be interested in talking with them." He stated his preference for operations

---

[1] The trial court dismissed defendant Times Mirror Company (Times) for lack of personal jurisdiction. Given our disposition of the case, we need not consider plaintiff's contention that the court erred in dismissing Times.

work, but would not rule out maintenance, if that were the only job offered.

In August, 1985, plaintiff met with Drake and Drake's subordinate, Firth. To induce plaintiff to stay with the company until the sale of the mill or the entire wood products division, Drake offered plaintiff the option of a position in one of Publisher's paper mills or a "stay bonus." Plaintiff's notes of the meeting reflect three alternatives. First, if he stayed and the wood products division was sold, and if he was terminated within 90 days of the sale, he would receive $20,000 as a "stay bonus," plus full severance pay, totalling approximately $36,700. Second, if he stayed with the wood products division and was kept on by the new owners, he would receive half of the "stay bonus"—$10,000. If he accepted the "stay bonus," it would be payable at the time of the sale of the wood products division. Third, he could forfeit the "stay bonus" and opt for guaranteed employment in one of Publisher's paper mills. Although Drake could not give plaintiff details about the job, plaintiff's notes of the meeting reflect that, if he chose continued employment, the position would be comparable to his present one, and he would be moved into the paper mill as soon as possible, even before the sale of the wood products division closed. Because Drake lacked specific information regarding the position at the paper mill, he advised plaintiff not to make a decision at that time.

Thereafter, on several occasions, plaintiff requested, but never received, written confirmation of the offer of a "stay bonus" and additional information regarding a position in the paper mill. By November, 1985, plaintiff had heard nothing further on the subject of his August meeting with Drake and Firth. Afraid that he had been lost in the shuffle, he met again with Drake to get more information. He still knew nothing about the job in the paper mill and, therefore, could not decide which option to take.

Times never sold the mill or the wood products division. Instead, it sold 80 percent of Publisher's stock to Smurfit in February, 1986.[2] Plaintiff remained at the Tillamook sawmill after Smurfit's stock acquisition. In July, 1986, Smurfit contemplated selling the Tillamook sawmill and offered

---

[2] Publishers changed its name to Smurfit Newsprint Corp. on June 2, 1986.

several key employees, by letter, an additional "stay bonus,"[3] contingent on their remaining at the sawmill until the proposed sale had closed. Although not one of the chosen few, plaintiff became aware of the offer that was made to the others.

■ Upset by his omission, plaintiff contacted Smurfit. He complained that he had never received the original "stay bonus" and had not been offered the second "stay bonus" by Smurfit. At least at the outset, Smurfit maintained that the original promise of a "stay bonus" or alternative employment was the sole responsibility of Times. However, after several conversations with Smurfit management, on August 20, 1986, plaintiff executed this letter agreement:

"Subject: *Stay Bonus Consideration*

"Dear Mr. Edwards:

"This letter will serve to clarify the uncertainties surrounding your eligibility for stay bonus consideration.

"After reviewing your statements and statements of others that were involved in discussing your options prior to Jefferson Smurfit Corporation's acquisition of Publishers Paper Company, it would appear that you are entitled to some form of stay bonus.

"It was your feeling that one-half of the $20,000 stay bonus mentioned by J.R. Drake would be the appropriate amount.

"I have deliberated on the circumstances involved and agree that the sum you have indicated would be appropriate.

"Because of the very limited nature of stay bonus consideration, it is vital that you keep the existence and terms of this absolutely confidential.

"We face a major challenge in integrating Publishers Paper Company into those of Jefferson Smurfit Corporation and in making the wood products operations a profitable part of the company. I believe your leadership and personal contribution during recent months have made a major difference in our operating results.

"Please sign in the space provided below that this stay bonus payment satisfies those representations made to you concerning this matter. Upon return of a fully executed copy

---

[3] The additional "stay bonus" would equal 50 percent of the employee's original "stay bonus."

of this letter, a check will be issued as full payment in this matter."

Plaintiff remained in Smurfit's employ until January 31, 1987, when Smurfit terminated his employment. He received more than $15,000 in severance pay at that time.

On appeal, plaintiff contends that he is entitled to an additional $20,000 for the original "stay bonus" and an additional $16,793 in severance pay from Publishers and Times. He contends that the trial court erred in granting summary judgment, because a question of fact exists as to whether he settled his claim for the original "stay bonus." He argues that the letter agreement is ambiguous, because the receipt for $10,000, signed on August 20, 1986, reflects only a resolution of the negotiations for an additional "stay bonus" from Smurfit, to which he believed he was entitled. Because of the ambiguity, he argues, extrinsic evidence is necessary to interpret the document; therefore, the intent of the parties is a question for the trier of fact.

■■ Whether a contract is ambiguous is a question of law, *Timberline Equip. v. St. Paul Fire and Mar. Ins.,* 281 Or 639, 643, 576 P2d 1244 (1978), as is the interpretation of an unambiguous contract. A contract is ambiguous "if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation." *Deerfield Commodities v. Nerco, Inc.,* 72 Or App 305, 317, 696 P2d 1096, *rev den* 299 Or 314 (1985). In determining whether an agreement is ambiguous, we are limited to the four corners of the document. *Jarrett v. U.S. National Bank,* 81 Or App 242, 246-47, 725 P2d 384 (1986), *rev den* 302 Or 476 (1987); *but see Welsh v. U.S. Bancorp,* 286 Or 673, 690, 596 P2d 947 (1979).

The letter expressly provides that the subject matter of the agreement is plaintiff's "stay bonus consideration." The first paragraph articulates the purpose of the agreement, which is to clarify the uncertainties regarding plaintiff's eligibility for "stay bonus" consideration. In the second paragraph, Smurfit admits that plaintiff was entitled to "some form of stay bonus." The bases for that entitlement were *past* discussions and *prior* representations made by *Publishers'* employees. Contrary to plaintiff's assertions that he was settling only the current additional "stay bonus," the letter does not mention any current negotiations between plaintiff and

Smurfit, and plaintiff concedes that he never received a "stay bonus" offer from Smurfit. To the contrary, it states unambiguously that plaintiff appears to be entitled to some form of "stay bonus" *on the basis of conversations with Publishers' management prior to Smurfit's acquisition.* Plaintiff cannot rely on his subjective beliefs to contradict the agreement's plain language or to create an ambiguity that does not exist. *Life Fin. Incorp. X v. Amer. Guaranty Fin. Corp.,* 74 Or App 497, 500-01, 704 P2d 122 (1985).

The amount to which plaintiff was entitled was discussed in the third and fourth paragraphs. Plaintiff suggested $10,000, "one-half of the $20,000 stay bonus mentioned by J.R. Drake," to which Smurfit agreed. That understanding is consistent with plaintiff's notes of Drake's original offer that, if he stayed on with the new owners, he would be entitled to receive $10,000. The fifth paragraph expresses the need for strict confidentiality. The sixth paragraph addresses the challenge of integrating Publishers into Smurfit and plaintiff's role in that integration. It commends plaintiff on his *past* performance; it does not hint of an impending sale of the Tillamook sawmill by Smurfit or of Smurfit's need to secure plaintiff's employment pending a sale.

If there is any ambiguity, it is in the final paragraph:

> "Please sign in the space provided below that this stay bonus payment satisfies those representations made to you concerning this matter. Upon return of a fully executed copy of this letter, a check will be issued as full payment in this matter."

Although we agree with plaintiff that that paragraph is not a model of clarity, we do not agree that the meaning of the phrase "in this matter" cannot be resolved by reference to the preceding paragraphs. We interpret the agreement as a whole, not word by word, or sentence by sentence. *Deerfield Commodities v. Nerco, Inc., supra.* Viewing the entire agreement, we conclude that the phrase refers to the subject matter of the contract, *i.e.,* resolution of plaintiff's "stay bonus" entitlement that arose before Smurfit acquired Publishers' stock.

■ Plaintiff claims that, before he signed the letter agreement, he expressed to Smurfit his reservation of the right to collect the original "stay bonus" from Times. Not only does

the agreement contain no such reservation, plaintiff's extrinsic evidence of prior and contemporaneous negotiations contradicts the express language of the settlement agreement and is, therefore, barred by the Parol Evidence Rule. ORS 41.470; *Deering v. Alexander,* 281 Or 607, 576 P2d 8 (1978). Plaintiff executed the settlement agreement, despite the absence of the alleged "reservation of right," and notwithstanding a provision that the agreement constituted "full payment in this matter." The agreement lends itself to only one sensible and reasonable interpretation: Plaintiff fully settled his claim for the original "stay bonus" by accepting $10,000. Therefore, there is no genuine issue of material fact, and the trial court did not err in granting summary judgment in favor of defendants on the "stay bonus" claim.

■ Although plaintiff received more than $15,000 in severance pay when he was terminated by Smurfit in January, 1987, he contends that he is entitled to an additional $16,793, the amount originally promised by Publishers'. Plaintiff's own notes memorializing the conversation with Drake in August, 1985, refute that contention. If he stayed, and the wood products division was sold, and if he was terminated *within 90 days after the sale of the company,* he would receive full severance pay, plus a "stay bonus" of $20,000. If he stayed with the wood products division, and was employed by the new owners, he would receive only half of the "stay bonus." When Times sold a controlling interest in Publishers to Smurfit, plaintiff remained in Publishers' employ. Because his employment was not severed within 90 days after the Smurfit acquisition, he was not entitled to severance pay. There was no error in granting summary judgment on plaintiff's additional severance pay claim.[4]

Affirmed.

---

[4] Aside from the oral promise of full severance pay, plaintiff appears to assert a separate contractual right to additional severance pay based on Publishers' policy existing at the time of Smurfit's stock acquisition. *See Sabin v. Willamette-Western Corp.,* 276 Or 1083, 557 P2d 1344 (1976). However, plaintiff's employment was not terminated at that time. Therefore, regardless of whether he knew of Publishers' policy regarding severance pay, he was not terminated at the time of the stock acquisition and was not entitled to severance pay from Publishers.