**Douglas G. MAIER, Plaintiff,**

v.

**PACIFIC HERITAGE HOMES, INC., an Oregon Corporation, Pacific Santa Fe ˙ Corporation dba Pacific Land Management, Inc., and Mark Rockwell, Defendants.**

**No. CV–98–1095–ST.**

United States District Court, D. Oregon.

Oct. 18, 1999.

Martin Dolan, Ramis Crew Corrigan & Bachrach, LLP, Kevin Nicholas Keaney, Portland, OR, for Douglas G. Maier, Plaintiff.

Sarah J. Ryan, Ball Janik LLP, Kathryn A. Short, Office of County Counsel, Gordon L. Osaka, Portland OR, for Pacific Heritage Homes, Inc., Defendant.

Kathryn A. Short, Office of County Counsel, Gordon L. Osaka, Portland OR, for Pacific Santa Fe Corp. dba Pacific Land Management Inc., Defendant.

## OPINION AND ORDER

STEWART, United States Magistrate Judge.

### INTRODUCTION

Plaintiff, Douglas G. Maier ("Maier"), brings this action against his former employer and others for: (1) wage violations under ORS 652.150; (2) breach of an express contract; (3) breach of an implied contract; (4) breach of the duty of good faith and fair dealing; (5) promissory estoppel; (6) misrepresentation; and (7) fraud.

Maier is a resident of Florida. Defendants Pacific Heritage Homes, Inc. ("Pacific Heritage Homes") and Pacific Santa Fe Corporation dba Pacific Land Management, Inc. ("Pacific Santa Fe") are Oregon corporations, with headquarters in Durham, Oregon. Defendant Mark Rockwell ("Rockwell") is the president and owner of both Pacific Heritage Homes and Pacific Santa Fe and is presumed to be an Oregon resident. The amount in controversy exceeds $75,000. Thus, this court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C. § 636(c).

Now before the court is defendants' motion for summary judgment (docket # 17) seeking dismissal of all of Maiers' claims. For the reasons set forth below, that motion is granted.

### STANDARDS

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving

party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.*, 818 F.2d 1466, 1470 (9th Cir.1987), *cert denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). The Ninth Circuit has stated, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id* at 1468.

### FACTS

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence in the light most favorable to Maier. A review of the parties' facts, as well as the other materials submitted by the parties, including affidavits and deposition excerpts, reveals the following:

Pacific Santa Fe is an Oregon corporation in the business of residential building construction. Pacific Heritage Homes is a related Oregon corporation which, during the course of Maier's employment, was in the business of production home building. Rockwell is, and has been at all relevant times, the president of both Pacific Santa Fe and Pacific Heritage Homes.

In a letter dated June 3, 1996, Rockwell extended Maier an offer of employment for the position of Vice President and General Manager of Pacific Heritage Homes. Rockwell told Maier that he could not pay him a $100,000 salary as Maier had requested, but assured Maier that if he would accept $75,000 a year, the difference would be made up in bonuses and equity participation. Maier accepted this offer and signed an employment agreement on June 4, 1996.

The employment agreement specifies a $75,000 salary, a start date of June 16, 1996, and numerous other conditions and

benefits. Of relevance to this case are two sections. The first section states: "Bonus: Based on the profitability and growth of the company, as well as your personal performance, you will qualify for an annual bonus of 30% to 50% of your base salary." Defendants' Exhibit ("Ex") 3. The second section of this letter, entitled "Equity Participation," provides as follows:

> One of the business objectives of Pacific Realty Ventures (PRV), a division of Pacific Santa Fe Corporation (PSF), is to develop and maintain ownership in a variety of income producing properties. The company has committed to transfer 25% of its net-ownership position, in each of the projects it develops and retains ownership in, to employees working for Pacific Santa Fe Corporation and sister companies such as Pacific Heritage Homes. Details on how you and other employees will share in the ownership of these projects is currently being developed.

*Id.*

Shortly after accepting Rockwell's employment offer, Maier left his previous job in Michigan, which paid $96,000 a year, and moved to Oregon. Maier began working for Pacific Heritage Homes on or about July 22, 1996.

In the summer of 1997, Maier invited Jerrold A. Boscoe ("Boscoe"), an outside consultant, to speak at a strategic planning meeting for Pacific Heritage Homes. In or around August 1997, Boscoe began evaluating the Pacific Heritage Home organization, including certain key personnel. Boscoe evaluated Maier and concluded that he "lacked the depth of experience and knowledge necessary to appropriately execute the requirements" of his position at Pacific Heritage Homes. Based on this evaluation, as well as on its direct observations of Maier's performance, Pacific Heritage Homes decided to terminate Maier's employment.

On September 23, 1997, Pacific Heritage Homes presented Maier with a document entitled "Termination of Employment." This document provided that "[i]n lieu of any other or additional consideration for your having previously accepted employment by, and for the services you have performed for the company, we are prepared to provide the following severance benefits...." The document also requested that, "[I]f you are prepared to accept the above severance package, please sign and date." The "severance benefits" offered in this document included more than two months full salary, insurance coverage, payment for unused vacation days, and the continued use of a company vehicle for 30 days.

Maier did not immediately accept the offer, but took it home and reviewed it with his wife. Maier then made a counter-offer. The terms of this counter-offer are incorporated in a document entitled "Severance Benefits," dated September 25, 1997, which states in part that "[t]his is in response to our previous discussions regarding Severance Benefits. We are willing to amend the Severance Benefits portions of your termination agreement as follows...." This amendment increased the benefits provided to Maier, included a relocation allowance, and allowed extended use of a company vehicle.

On September 26, 1997, Rockwell, as President of Pacific Heritage Homes, and Maier signed both the "Termination of Employment" document and the "Severance Benefits" document. Pacific Heritage Homes has since fulfilled its duties and obligations under the "Termination of Employment" document and the "Severance Benefits" document (collectively referred to as the "Termination Agreement").

All of Maier's present claims are based on the fact that he was never paid the bonus or awarded the equity participation referred to in his employment agreement and do not relate to the Termination Agreement.

## DISCUSSION

### I. *Motions to Strike*

As a preliminary matter, this court must first address Maiers' motions to strike cer-

**1190**

tain affidavits and exhibits submitted by the defendants.

### A. Affidavit of Sara Ryan, Exhibits 3 and 4

■ Maier has moved to strike two exhibits attached to the affidavit of defendants' attorney, Sara Ryan ("Ryan"). The first, Exhibit 3, is the employment agreement between Maier and Pacific Heritage Homes. The second, Exhibit 4, is a memorandum from Maier to Rockwell, dated September 26, 1997, after Maier's termination. Maier asserts that both of these documents should be stricken because Ryan is not qualified to authenticate either document.

This court disagrees. Maier pled the existence and terms of the employment agreement in his complaint and does not dispute either its existence or contents. In addition, Rockwell later submitted an affidavit to authenticate the exhibits. Since Rockwell was a party to the negotiations surrounding the employment contract and a recipient of the memorandum, his affidavit suffices to authenticate the exhibits. Thus, Maier's motion to strike the exhibits is denied.

### B. Affidavit of Mark Rockwell, ¶¶ 8 and 9

■ Maier moves to strike paragraphs 8 and 9 of Mark Rockwell's affidavit, claiming that they are not relevant to any issue raised by defendant's motion. Paragraph 8 states that Pacific Heritage Homes did not make a profit while Maier was an employee. However, one of the conditions attached to the bonus provision of the employment agreement was the "profitability and growth of the company." Thus, testimony that the company did not make a profit is relevant to the issue of whether Maier is entitled to any bonus.

■ Paragraph 9 delineates some of the reasons for Maier's termination and Maier's performance was a condition to receiving a bonus. Further, defendants allegedly terminated Maier because of performance issues. Thus, the reasons for Maier's termination directly relate to performance issues which, in turn, relate to the bonus issue. Accordingly, any evidence relating to Maier's job performance is also material.

Because both of these paragraphs are relevant to issues raised in the motion for summary judgment, Maier's motion to strike paragraphs 8 and 9 of Rockwell's affidavit is denied.

### C. Affidavit of Jerrold A. Boscoe

■ Maier argues that Boscoe's affidavit, with certain exceptions, should be stricken because it is "largely irrelevant or states inadmissible hearsay." Because the affidavit contains numerous admissions by Maier, as well as personal observations by Boscoe, it is relevant and, for the purposes of this motion, not hearsay. Therefore Maier's motion to strike Boscoe's affidavit is denied.

### II. Summary Judgment Motion

Defendants seek summary judgment because: (1) Maier released his right to bring any claims arising from his employment agreement when he signed and accepted the Termination Agreement; (2) the contract claims against Rockwell and Pacific Santa Fe are untenable because Maier's only contractual relationship was with Pacific Heritage Homes; and (3) neither Rockwell nor Pacific Santa Fe made any promises or representations which would subject them to tort liability.

### A. Enforcement of the Release Against Pacific Heritage Homes

Defendants argue that according to the plain language of the Termination Agreement, Maier effectively settled and released any and all claims he may have had against Pacific Heritage Homes arising from his employment. Maier counters that the language commonly associated with releases, such as "release," "waiver," "separation agreement," "claims," and "settlement agreement" is notably absent from the Termination Agreement. Maier

thus asserts that the Termination Agreement is nothing more than a severance package for an employee terminated before the expiration of his contract and does not release any claims.

## 1. *Legal Standard*

■ A release is a contract in which one or more parties agree to abandon claims or rights. *Lindgren v. Berg,* 307 Or. 659, 665, 772 P.2d 1336, 1339 (1989). A release agreement thus is subject to construction and interpretation like any other contract. *Ristau v. Wescold, Inc.,* 318 Or. 383, 387, 868 P.2d 1331, 1333 (1994). "Inherent in the purpose of a release agreement is a promise to abandon a claim or right that is within the contemplation of the parties." *Patterson v. Am. Med. Systems,* 141 Or.App. 50, 53, 916 P.2d 881, 882, *review denied,* 324 Or. 229, 925 P.2d 907 (1996) (citation omitted).

■ If the terms of the release unambiguously express the intent of the parties, the release must be enforced accordingly. *Id.* at 53, 916 P.2d 881, 916 P.2d at 882. If the terms of the release are ambiguous, then the trier of fact is to ascertain the intent of the parties and construe the contract consistently with their intent. *Id.,* citing *OSEA v. Rainier Sch. Dist. No. 13,* 311 Or. 188, 194, 808 P.2d 83, 87 (1991). A contract only is ambiguous if the contract is capable of more than one sensible and reasonable interpretation. *Id.,* citing *Deerfield Commodities v. Nerco, Inc.,* 72 Or.App. 305, 317, 696 P.2d 1096, 1104–05, *review denied,* 299 Or. 314, 702 P.2d 1111 (1985).

■ "The rule is that '[a]n honest release, untainted by unconscionable conduct, can[not] be set aside because it was improvident.'" *Walcutt v. Inform Graphics, Inc.,* 109 Or.App. 148, 151, 817 P.2d 1353, 1355 (1991) (citation omitted). Releases and settlements are "favored by the law," and are not rendered unenforceable either by "ordinary mistakes" or negligent mistakes in the parties' knowledge and understandings when they enter into them.

*Id.,* citing *Davis v. Brown,* 280 Or. 561, 564, 571 P.2d 912, 914 (1977).

## 2. *Analysis*

### a. *Plain Language of the Release*

■ The critical language of the Termination Agreement provides that, "[i]n lieu of any other or additional consideration for your having previously accepted employment by, and for the services you have performed for the company, we are prepared to provide the following severance benefits...." While this language is not a model of lawyer-like drafting, it effectively releases Maier's claims against Pacific Heritage Homes for damages arising out of his employment prior to his termination.

■ An agreement must be interpreted as a whole, not word by word, or sentence by sentence. *Edwards v. Times Mirror Co.,* 102 Or.App. 440, 447, 795 P.2d 564, 568 (1990) (citation omitted). Viewed as a whole, the language is clear as to the intent of the Termination Agreement. Maier received severance benefits "in lieu of" any other "consideration" from Pacific Heritage Homes for "having previously accepted employment." Maier moved from Michigan in order to accept employment with Pacific Heritage Homes. Thus he accepted severance benefits "in lieu of" any other payment for making that move, including any loss of income from his former position for which he now seeks to recover damages. In addition, Maier received severance benefits "in lieu of" any other "consideration" from Pacific Heritage Homes for the "services [he has] performed for the company." This language clearly includes any damages Maier now seeks to recover for work performed for Pacific Heritage Homes throughout his employment, including loss of salary, bonuses, and equity participation.

■ Although the Termination Agreement fails to include words normally associated with releases and settlements, releases are not dependant on any "magic

words." Instead, releases are contracts and subject to the usual rules of contract interpretation. *See Ristau,* 318 Or. at 387, 868 P.2d at 1333. While the court agrees with Maier that the Termination Agreement is not a well drafted, typical release of claims, it cannot agree that the Termination Agreement is capable of "more than one sensible and reasonable interpretation." *Deerfield,* 72 Or.App. at 317, 696 P.2d at 1104–05, *review denied,* 299 Or. 314, 702 P.2d 1111 (1985).

In his affidavit Maier states that "I have never intended to release my claims against defendants and do not believe I have ever done so. Defendants never raised the issue of a release or waiver with me." Affidavit of Douglas G. Maier, pp. 1–2. However, the plain language of the Termination Agreement should have given Maier notice that he was giving up *something* in exchange for the severance benefits. The Termination Agreement expressly provided for benefits in exchange for "any other or additional consideration" for Maier's employment and Maier "cannot rely on his subjective beliefs to contradict the agreement's plain language or to create an ambiguity that does not exist." *Edwards,* 102 Or.App. at 446, 795 P.2d at 567.

Moreover, Maier's uncommunicated thoughts about the Termination Agreement are insufficient to create an ambiguity. As the Oregon Supreme Court has stated concerning a release, "the law in this jurisdiction does not permit contracts to be reformed merely because of uncommunicated mental reservations held by one of the parties at the time of execution." *Wheeler v. White Rock Bottling Co.,* 229 Or. 360, 365, 366 P.2d 527, 529 (1961).

**b.** *No Other Reasonable Interpretation*

Aside from the plain language of the Termination Agreement, the court is convinced that no other explanation for the Termination Agreement makes sense. Extrinsic evidence of the circumstances surrounding the formation of the release agreement may be considered in order to determine whether the release is ambiguous. *Abercrombie v. Hayden Corp.,* 320 Or. 279, 292, 883 P.2d 845, 853 (1994).

The Complaint alleges that Maier's employment agreement with Pacific included a two-year term. However, a review of the employment agreement, the Termination Agreement, and all other documents, depositions, and affidavits filed by the parties has failed to disclose any corroborating evidence of this alleged two-year term of employment. Instead of a two-year term, it appears that Maier was an "at-will" employee with no severance benefits.

Pacific Heritage Homes therefore had no contractual or legal responsibility to provide severance benefits to Maier. It did, however, elect to offer him severance benefits upon his termination. Pacific Heritage Homes not only offered Maier severance benefits, which it was not obligated to provide, but also negotiated over the amount and type of severance benefits. The final Termination Agreement reflects Pacific Heritage Homes' acquiescence to Maier's demands for a better severance package.

Maier has offered no reason why Pacific Heritage Homes would negotiate a severance agreement with him if he did not give up something in exchange. Because Maier was not entitled to severance benefits under his employment agreement, there was no rational reason why Pacific Heritage Homes would gratuitously pay him severance benefits. Instead, the logical inference is that this was a bargained-for exchange. Pacific Heritage Homes offered Maier a severance package in exchange for a release of any claims Maier may have had.

Although all defendants seek to benefit from the release of claims in the Termination Agreement, only Pacific Heritage Homes may do so. The Termination Agreement is on Pacific Heritage Homes' stationary, is signed by Rockwell as Pacific Heritage Homes' president, and refers specifically to Maier's position as Vice–

President and General Manager of Pacific Heritage Homes. It does not in any way purport to apply to Pacific Santa Fe or Rockwell. Thus, the Termination Agreement only releases Maier's claims against Pacific Heritage Homes.

### c. ORS 17.075

At oral argument, Maier asserted that ORS 17.075 precludes enforcement of any release in this case. ORS 17.075(1)(a) provides that "[a]n employer whose interest is or may become adverse to that of an injured employee shall not, within 15 days from the date of the occurrence causing the employee's injury ... negotiate or attempt to negotiate a settlement or compromise with the injured employee...."

For at least two reasons, this statute will not inhibit enforcement of the release. First, it applies only to personal injuries, not contract claims; and, second, the release was obtained more than 15 days after any alleged injury.

### (1) Inapplicability to Contract Claims

■ The only case that substantially addresses this statute is *Knutson v. Yamhill County*, 130 Or.App. 173, 881 P.2d 156 (1994) which interpreted ORS 17.075(3) not ORS 17.075(1)(a). ORS 17.075(3) allows an employee who "incurs a personal injury" to repudiate a release within one year.[1] The court applied ORS 17.075(3), without comment, to the plaintiffs' various tort claims for battery, intentional infliction of emotional distress, civil rights, and the Oregon Racketeer Influenced and Corrupt Organization Act. In contrast to this case, no contract claims were at issue in *Knutson*.

■ Unlike ORS 17.075(3) which specifically refers to an employee who "incurs a personal injury," ORS 17.075(1)(a) refers only to "an injured employee." To interpret ORS 17.075(1)(a) as applying to releases for all types of injuries to employees, while applying ORS 17.075(3) only to releases for personal injuries, would be both unreasonable and absurd. A statute should not be construed to produce an unreasonable or absurd result. *State v. Galligan*, 312 Or. 35, 39, 816 P.2d 601, 603 (1991). Therefore, this court interprets ORS 17.075(1)(a) as applying only to an employee who "incurs a personal injury."

■ Black's Law Dictionary describes a "personal injury" as, "[a] hurt or damage done to a man's *person*, such as a cut or bruise ... as distinguished from an injury to his property or his reputation." BLACK'S LAW DICTIONARY 925 (4th ed 1968). "Personal injury" also is described as "including any injury which is an invasion of personal rights, and in this signification it may include such injuries as libel or slander, criminal conversation with a wife, seduction of a daughter, and mental suffering." *Id*. Contract claims do not fall within the general definition of "personal injury" and are therefore unaffected by ORS 17.075(1)(a). Thus, Maier's contract claims (Second through Fifth Claims for Relief) fall outside the scope of ORS 17.075(1)(a).

The First Claim for Relief (wage claim) is similarly outside the scope of ORS 17.075(1)(a). While there was some uncertainty at oral argument as to the basis for this claim, no evidence suggests that it is based on a late or insufficient final paycheck. Rather, a review of the Complaint and other documents filed by Maier reveals that his wage claim is based solely on nonpayment of the bonus and equity participation provisions of the employment agreement. Such a claim is more properly construed as a contract claim than as a

---

1. ORS 17.075(3) states in full as follows: "Any settlement or compromise agreement entered into, any general release of liability ... after the employee incurs a personal injury, which is not obtained in accordance with ORS 17.085, requiring notice, may be disavowed by the injured employee within 12 months." ORS 17.085 states that ORS 17.075 shall not apply "if at least five days prior to obtaining the settlement ... the injured employee has signified the willingness of the injured employee that a settlement ... be given."

tort or "personal injury" claim and as such, is not affected by ORS 17.075(1)(a).

## 2. *The Timing*

 ORS 17.075(1)(a) only covers a situation where an employee executes a release or settlement "within 15 days from the date of the occurrence causing" the personal injury. Thus, in order for any of Maier's tort claims to be protected by ORS 17.075(1)(a), his injury must have occurred within 15 days of executing the Termination Agreement on September 26, 1997.

The tort claims derive from Pacific Heritage Homes' failure to give Maier a bonus and equity participation. The bonus was an "annual bonus," and therefore should have been awarded, if at all, at the end of Maier's first year of employment in June 1997 or perhaps at the end of the first calendar year in December 1996. Both possible dates are long before Maier executed the Termination Agreement. Because this "occurrence" that caused Maier's injury was more than 15 days before the signing of the Termination Agreement, ORS 17.075(1)(a) does not apply to the bonus provision of the employment agreement.

The equity participation provision of the employment agreement does not specify when (or how) such a scheme was to become effective. Thus, this court cannot presume that the "occurrence" of failing to provide equity participation is outside the ORS 17.075(1)(a) 15–day limit. As such, ORS 17.075(1)(a) may apply to the equity participation provision of the employment agreement, negating the Termination Agreement as it pertains to the tort claims based on that provision. Even assuming, however, that ORS 17.075(1)(a) saves those portions of the tort claims (the Sixth and Seventh Claims for Relief), summary judgment is still appropriate for the reasons discussed below.

### d. *Conclusion*

This court concludes that Maier unambiguously released all of his claims against Pacific Heritage Homes and that ORS 17.075(1)(a) does not save Maier from the consequences of the Termination Agreement as to the contract claims and the wage claim. Thus, defendants' motion for summary judgment is granted as to those claims against Pacific Heritage Homes.

## B. *Contract and Wage Claims Against Pacific Santa Fe and Rockwell*

Maier alleges express and implied contract claims against Pacific Santa Fe and Rockwell for: (1) breach of an express contract (Second Claim for Relief); (2) breach of an implied contract (Third Claim for Relief); (3) breach of the duty of good faith and fair dealing (Fourth Claim for Relief); and (4) promissory estoppel (Fifth Claim for Relief). Maier also alleges a wage claim against Pacific Santa Fe (First Claim for Relief). Pacific Santa Fe and Rockwell argue that all of these claims must fail because neither employed Maier or was a party to any contract with Maier.

### 1. *Contract Claims Against Pacific Santa Fe*

 Defendants argue that Maier was at all times an employee of Pacific Heritage Homes, and was never employed by Pacific Santa Fe. As such, defendants argue that Pacific Santa Fe is not a proper party to any of the contract claims brought by Maier (Second, Third, and Fourth Claims for Relief). In addition, Pacific Santa Fe argues that it could not be liable under a promissory estoppel theory because it made no promises to Maier.

 A mutuality of obligation is essential to the validity of any contract. *See Johnson v. Homestead–Iron Dyke Mines Co.,* 98 Or. 318, 329, 193 P. 1036, 1040 (1920). Formation of a contract requires a meeting of minds, which is measured by the objective manifestation of intent by both parties to form the contract. *Vanderselt v. Pope,* 155 Or.App. 334, 339, 963 P.2d 130, 133 (1998).

Maier has named Pacific Santa Fe as a defendant based upon his subjective belief that he was employed by Pacific Santa Fe. As purported evidence of this employment relationship, Maier submits his job description and his own deposition testimony.

The job description is for "V.P. & General Manager" in the "Senior Management" department for Pacific Santa Fe. It states that the position "serves as [a] member of [Pacific Santa Fe's] senior management team," and among other duties, "functions [as] an independent representative of Pacific Santa Fe Corp, with regard to judgment, decision-making, etc." Unfortunately for Maier, this job description is not sufficient to create a genuine issue of material fact. First, the job description only is a draft, prepared in August 1997, which was never approved. Draft copies of documents typically undergo many changes before a final document is produced. Second, and more importantly in this analysis, the draft job description was apparently prepared with information supplied exclusively by Maier. Deposition of Douglas G. Maier ("Maier Depo") pp. 354–55. Given that Maier believed that he was in some fashion an employee of Pacific Santa Fe, it is not surprising that a job description based on his information would describe him as a Pacific Santa Fe employee. The job description is therefore entitled to no more weight than Maier's own testimony about his relationship with Pacific Santa Fe.

Aside from the job description to establish that Pacific Santa Fe was a party to his employment contract, Maier relies on his own deposition testimony that he "*felt* [he] was going to work for Mark Rockwell's company, which was Pacific Santa Fe." Maier Depo, p. 121 (emphasis added). Maier testified that he "also *felt* [he] was working for Pacific Santa Fe," and that "Mark, when he talked to me on the telephone, said Pacific Santa Fe this and Pacific Santa Fe that." *Id.* at 121–22 (emphasis added). He understood that Pacific Heritage Homes, along with Pacific Land Management (a subsidiary of Benchmark) and Pacific Realty Ventures, were "divi-

sions of the parent company, Pacific Santa Fe." *Id.* at 121. He also testifies that "while one division of Pacific Santa Fe (Pacific Land Management) would deliver the lots and another (Pacific Heritage Homes) would build the homes, it was all part of working for 'one of the biggest land developers in Portland' Santa Fe." *Id.* at 122.

While Maier may have believed that he was employed by Pacific Santa Fe, the documents in front of this court tell a different tale. Maier cannot unilaterally create an employment relationship. The offer of employment, printed on Pacific Heritage Homes letterhead, clearly states that Maier will be an employee of Pacific Heritage Homes. This offer letter begins "Ref: Revised offer of employment: Vice President & General Manager, Pacific Heritage Homes, Inc." The letter then states, "[t]his is to confirm our earlier discussions regarding our offer for you to join Pacific Heritage Homes...." Pacific Heritage Homes issued Maier's paychecks and W–2 forms, as well as both the termination letter and related amendment. Rockwell, the president of both Pacific Santa Fe and Pacific Heritage Homes, also states in his affidavit that Pacific Heritage Homes and Pacific Santa Fe "are separate and independent corporate entities," and that Maier was never employed by Pacific Santa Fe. Affidavit of Mark Rockwell ("Rockwell Aff") ¶¶ 7, 4. The use of "Inc."as part of the name for Pacific Heritage Homes confirms that it has an independent legal existence and is not merely a division of Pacific Santa Fe. *See* ORS 60.094(1). Conceivably, Pacific Santa Fe could be a joint employer with Pacific Heritage Homes. However, the evidence of such a relationship is lacking.

Thus, this court finds no genuine issue of material fact remaining as to whether Pacific Santa Fe was Maier's employer or was a party to the employment contract between Pacific Heritage Homes and Maier. The objective evidence inescapably leads to the conclusion that Maier was an

employee of Pacific Heritage Homes only. Because Pacific Santa Fe was not a party to the underlying employment agreement, it cannot be liable on the contract claims.

Thus, the defendants' motion for summary judgment is granted as to the Second, Third, and Fourth Claims for Relief against Pacific Santa Fe.

### 2. *Promissory Estoppel Claim Against Pacific Santa Fe*

 Pacific Santa Fe is entitled to summary judgment against the promissory estoppel claim as well. Maier alleges that Rockwell made promises to him regarding payment of a bonus and equity participation, and these promises form the basis for the promissory estoppel claim. In making these alleged promises, Rockwell was acting as an officer of Pacific Heritage Homes, not Pacific Santa Fe. Thus, Pacific Santa Fe cannot be liable as a principal for Rockwell under a promissory estoppel theory.

Accordingly, defendants' motion for summary judgment is granted as to the promissory estoppel claim (Fifth Claim for Relief) against Pacific Santa Fe

### 3. *Wage Claim Against Pacific Santa Fe*

 Pacific Santa Fe also is relieved of any liability under Maier's wage claim (First Claim for Relief). ORS 652.140 specifically applies only to employers. "Whenever an *employer* discharges an employee ... all wages earned and unpaid at the time of such discharge or termination shall become due and payable...." ORS 652.140 (emphasis added). Because Pacific Santa Fe was not, at any time, Maier's employer, Pacific Santa Fe cannot be liable for unpaid wages under ORS 652.140.

Accordingly, defendants' motion for summary judgment is granted as to the wage claim (First Claim for Relief) against Pacific Santa Fe.

### 4. *Contract and Wage Claims Against Rockwell*

At oral argument, counsel for Maier conceded that Rockwell was not a proper party for the wage and contract claims. As a result, defendants' motion for summary judgment is granted as to the First, Second, Third, Fourth, and Fifth Claims for Relief against Rockwell. Thus, the only remaining claims against Rockwell are the Sixth and Seventh Claims for Relief.

### C. *Tort Claims Against All Defendants*

Maier's Sixth and Seventh Claims for Relief against all defendants allege misrepresentation and fraud. Both of the claims are based on the same allegedly fraudulent misrepresentations made by Rockwell concerning payment of a bonus and equity participation. Defendants seek summary judgment on these claims based on Maier's failure to establish that Rockwell made promises with an intent not to perform. Defendants also argue that the employment agreement contains no actionable promises of bonuses or equity participation.

### 1. *Legal Standard*

 In order to recover for fraud and/or intentional misrepresentation, Maier must establish: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the listener in the manner reasonably contemplated; (6) the listener's ignorance of the representation's falsity; (7) the listener's reliance on the truth of the representation; (8) the listener's right to rely thereon; and (9) the listener's consequent and proximate injury. *Webb v. Clark*, 274 Or. 387, 391, 546 P.2d 1078, 1080 (1976) (elements for a fraud claim); *Johnsen v. Mel–Ken Motors, Inc.*, 134 Or. App. 81, 89, 894 P.2d 540, 545 (1995) (same elements for a claim of intentional misrepresentation).

 If the misrepresentation is a promise, then the plaintiff must show that the defendant either did not intend to perform when he made the promise or that he made the promise with reckless disregard as to whether he could perform. *Sproul v. Fossi*, 274 Or. 749, 752, 548 P.2d 970, 972

(1976) (citations omitted). A "fraudulent intent not to keep a promise can be inferred *if sufficient circumstances are shown to support such an inference.*" *Id.* at 752–53, 548 P.2d at 972–73 (citation omitted) (emphasis added).

### 2. *Analysis*

#### a. *Promises*

The threshold issue is whether Rockwell made any actionable promises. The alleged representations by Rockwell are encapsulated in the original offer of employment signed by both Maier and Rockwell on June 4, 1996. Maier's deposition testimony is clear that he accepted the language of the employment offer letter as representative of the oral discussions concerning a bonus and equity participation:

Q: Did [Rockwell] explain to you what the bonus was based upon?

A: No. Just what you see in [the employment agreement.]

Q: Did it ever get down to criteria?

A: Not until it came in [the employment agreement.]

Q: Did you ever tell Mr. Rockwell that you would not move out here ... unless you were paid $100,000 per year plus a bonus, plus an equity position?

A: I told Mr. Rockwell that I agreed to [the employment agreement.]

Maier Depo, pp. 114, 120.

■ The employment agreement does not contain an unequivocal promise to transfer to Maier an equity portion. The equity provision merely states that the company is "committed to transfer 25% of its net-ownership position" to all employees, and that details are "currently being developed." How much, to whom, and when are not specified. Defendants' Ex 3. This provision, under any interpretation, is simply not definite enough to give rise to an action for fraud or misrepresentation.

The bonus provision, however, is not as uncertain as the equity participation provision. It states that Maier "will qualify for an annual bonus of 30% to 50% of [his] base salary." *Id.* The phrase "will qualify"

is mandatory, not discretionary. Defendants argue that this provision means that Maier would qualify, depending on his performance, for a bonus ranging anywhere from 0% to 50% of his salary. Maier, however, understood this provision to mean that he would receive a minimum annual bonus of *at least* 30% of his salary and, if justified by his performance, up to a maximum of 50%. Since 30% of the $75,000 base salary is $25,000, Maier's salary plus bonus would equal a minimum of $100,000. Maier's interpretation is reasonable, given that $100,000 is the same amount Rockwell allegedly promised to pay Maier in order to induce him to change jobs, regardless of performance. However, even if Maier's understanding is correct, summary judgment nevertheless is appropriate for another reason.

#### b. *Rockwell's Intent Not to Perform*

■ One of the elements needed to prove either a misrepresentation claim or a fraud claim is evidence of "the speaker's knowledge of ... falsity or ignorance of its truth...." *Webb*, 274 Or. at 391, 546 P.2d at 1080. Maier has failed to produce any evidence that at the time Rockwell allegedly made false representations, or signed the employment agreement, he did not intend to perform. The mere failure to perform a promise is not sufficient to support an inference that a party did not intend to perform at the time the promise was made. *Conzelman v. N.W.P. & D. Prod. Co.*, 190 Or. 332, 352, 225 P.2d 757 (1950). "[O]ther circumstances must be shown to support an inference that the promisor never intended to perform." *Id.*

■ At most, Maier has produced evidence that the bonus and equity sharing did not occur. That fact alone is not enough to survive summary judgment. "It is, of course, elementary that the mere nonperformance of a promise made, or the failure to carry out an intention expressed, in the course of negotiations, is neither fraud nor evidence of fraud." *Cameron v. Edgemont Invest. Co.*, 136 Or. 385, 299 P. 698, 702 (1931); *See also Conzelmann*, 190

Or. at 352, 225 P.2d at 757 ("mere failure to perform a promise is not sufficient to support an inference that a party did not intend to perform").

Therefore, defendants' motion for summary judgment is granted as to the Sixth and Seventh Claims for relief against all defendants

### *ORDER*

Defendants' motion for summary judgment (docket # 17) is hereby GRANTED as to all claims against all defendants.